## JACKSON v. UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 720.   Submitted January 10, 1913.—Decided June 16, 1913.

This court considers it a grave error for the court charged with the duty of making findings of fact to include mere conclusions of law.

Statements as to what the relation of the United States is to levee work on the Mississippi River and what the power of the Mississippi River Commission over all such work is by whomsoever performed are conclusions of law and not of fact.

Congress did not, by the creation of the Mississippi River Commission, assume entire control of the levee work to the displacement of state or local authorities who continued to construct levees for protection from overflow which combined with those constructed by the United States for improvement of navigation, so that eventually a complete system would be evolved.

Damages, if any, by overflowing adjacent lands, occasioned by the levee system of the Mississippi River Valley could only result from concurrent action of the United States, the States and their subordinate agencies and individuals all impelled by different considerations, but all working towards the common end of having an efficient and continuous line of levees.

(1)

An individual owner has no right to insist that primitive conditions be suffered to remain and thus all progress and development be rendered impossible.

An individual owner protecting his own property from a common natural danger acquires no right thereby to insist that other owners or the Government shall adopt the same method or that they shall not adopt different methods for the protection of their respective properties or for the public good.

The United States is not responsible for damages by overflow or for failure to construct additional levees along the Mississippi River Valley, so as to afford increased protection from increased overflow caused by the levees that were constructed by state and Federal authority at other points; nor do such damages amount to taking the land overflowed for public use within the meaning of the Fifth Amendment.

The rule that the United States has plenary power to legislate for the benefit of navigation and is not liable for remote or consequential damages caused by works constructed to that end has already been directly applied to the work of the Mississippi River Commission. *Bedford* v. *United States*, 192 U. S. 225.

THE facts, which involve the question of liability of the United States for damages alleged to have been sustained by the owner of a plantation in the Mississippi River Valley by reason of the improvement of the Mississippi River under direction of the Federal Commission charged with that work, are stated in the opinion.

*Mr. Waitman H. Conaway* for appellants.

*Mr. Assistant Attorney General John Q. Thompson* and *Mr. J. Harwood Graves* for the United States.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

This suit was brought to recover from the United States the value of property asserted to have been totally destroyed or rendered completely valueless as the result of

certain public work "done in pursuance of the acts of Congress authorizing it, for the public benefit, under the direction of the Mississippi River Commission and the Secretary of War and the United States engineers." And it was charged that under the circumstances stated and the facts alleged, the property had been taken by the United States for public use "within the meaning of the constitutional provision," and it was averred that there was consequently imposed "on the United States an implied obligation to make compensation for the property so taken and destroyed."

It becomes necessary to give a brief description of the topography of the country in which the property in question is situated, in order to make clear its relation to the public work which it is asserted constituted a taking within the meaning of the Constitution.

The Valley of the Mississippi River, may in a broad sense be said to commence at Cape Girardeau, Missouri, and to extend from there to the mouth of the river at the Gulf of Mexico. The river, however, in its course to the ocean does not run through the center of the vast fertile and alluvial plains which in a comprehensive and generic sense constitute the delta of the Mississippi. On the contrary the situation of the river in this respect varies, occasioned by the fact that at divers places the upland or hill country approaches to or constitutes the bank of the river. The difference in this regard is marked between the west and the east banks. The west bank is divided into four great basins—the St. Francis Basin, which extends from Cape Girardeau to Helena; the White River Basin, which extends from Helena to the mouth of the Arkansas; the Tensas Basin, which extends from the mouth of the Arkansas to the mouth of the Red River; and the Atchafalaya Basin, extending from the mouth of the Red River to the Gulf. Practically in the long sweep from Helena, where St. Francis Basin ends and the White River Basin

begins, to the ending of the Atchafalaya Basin at the Gulf
there is no real topographical distinction between the
basins, the west bank of the river in that great distance
consisting of alluvial country having generally a very wide
though varying expanse. The division into basins putting
out of view the St. Francis Basin, is therefore merely the
result of a consideration of the watershed of each basin,
all the water, however, from each ultimately finding its
way to the Gulf of Mexico, either through the Mississippi
River, or in the lower basins in part at least by the means
of streams flowing independently of the Mississippi River
to the Gulf of Mexico. On the east bank the situation is
different. In the long stretch from Cairo, Illinois, to a
point a short distance below Memphis, generally speaking,
the hills and uplands border the river and constitute its
bank. From the point below Memphis to which we have
referred to Vicksburg, Mississippi, this is not the case,
and there is a great basin known as the Yazoo Basin,
which, aside from peculiarities of its own, may be said to
possess the same general characteristics as the basins on
the west bank of the river. From Vicksburg where the
uplands come to the river and constitute its bank, down
to Baton Rouge, Louisiana, where the hills or uplands per-
manently recede from the river a different condition from
that which exists on the west bank obtains. As we are
concerned only with the situation below Natchez we put
out of view any statement concerning the east bank be-
tween Vicksburg and Natchez, and refer only to the con-
ditions existing on the east bank between Natchez and
Baton Rouge.

From Natchez where the hills or uplands constitute the
bank of the river to Baton Rouge, the line of hill or upland
does not follow the course of the river, but recedes there-
from for a certain distance and then again abuts on the
river, this process being repeated from point to point
until Baton Rouge is reached. Of necessity therefore be-

tween the point of each departure of the uplands from the river to the point of reapproach there is an area of alluvial country bounded on the west by the river and constituting its bank, on the east by the hills, which as it were like a festoon or semicircle inclose the alluvial area between the river, the base of the uplands or hills, and the points of departure from and approach to the river as above stated.

These various areas constitute in the nature of things, minor basins having their own watershed.  And between Natchez and Baton Rouge there are five of these minor basins, one between Natchez and Ellis Cliffs, sixteen miles below Natchez, another between Ellis Cliffs and Fort Adams, thirty-nine miles below Ellis Cliffs, a third between Fort Adams and Tunica, seventeen miles below Fort Adams, and two others between Tunica and Bayou Sara, twenty-three miles below Tunica, and from Bayou Sara to Baton Rouge, a distance of thirty-five miles.  These subordinate basins are included in a general local levee district known as the Homochitto district.  A full and accurate statement concerning these basins, of their relation to levee building, and overflow, will be found in Document No. 1010, House of Representatives, 63rd Congress, third session, being a letter of the Secretary of War transmitting to the House of Representatives a full report of a survey made by direction of Congress, by the Mississippi River Commission, of these basins.  Of the basin between Ellis Cliffs and Fort Adams, the report of the Commission makes the following statement:

"Between Ellis Cliffs and Fort Adams, a distance of 39 miles by river, lies a basin whose protection from floods is greatly complicated by the presence of lakes, streams, and swamps.

"It has a total area of 59,412 acres, including 9,781 acres of cleared and 49,631 acres of wooded land, the assessed value of which is $204,739.

"The systematic protection of the basin as a whole is

impracticable without including drainage work of large proportions.

"It will be observed that there is a large amount of cleared land which is now being cultivated although meagerly protected from floods by small private levees.

"Owing to the extent of swamp lands the cultivated area could not be greatly extended by the construction of a levee along the river front.

"The benefits to be derived from the construction of a levee are relatively small as compared with the cost, and the work cannot be recommended."

In February, 1894, the appellants or their predecessors in title for whom they have been substituted on the record, filed their petition in the Court of Claims against the United States, alleging themselves to be the owners of various tracts of land in Adams County, Mississippi, composing three plantations. It was alleged as follows:

"2. That before and prior to the year 1890 said plantation from its natural situation, was comparatively high and exempt from overflow from the waters of the Mississippi river, except at long intervals, and the occurrence of such overflows did not materially affect its productive capacity, or its value.

"That said plantation was highly improved, well stocked with laborers and tenants, yielded yearly large crops of cotton, corn and other products, and was worth the sum of fifty thousand dollars.

"3. That about the year 1883 the officers and agents of the United States, in pursuance of the act of Congress creating the Mississippi River Commission, and of the subsequent acts for the improvement of the navigation of the Mississippi River, adopting the so-called Eads' plan, projected, and have constructed, and are constructing, a system of public works for the purpose of so confining the waters of the river between lines of embankment, or levees, as to give increased elevation and velocity

and force to the current in order to scour and deepen the channel, and have thus caused an increased and abnormal elevation of at least four feet to the waters of the river at the high water or flood stage; and for said purposes have adopted and made use of systems of public and private levees, originally constructed for the reclamation of overflowed lands, on the west bank from the highlands of Arkansas to the mouth of the Red river, and from the mouth of the Red river to the Passes, and on the east bank from the highlands of Tennessee to the mouth of the Yazoo river, and from Baton Rouge to the Passes; but from the mouth of the Yazoo river to Baton Rouge, instead of adopting and constructing levees, have made use of the highlands skirting the river for said purpose, and have thus placed the plantations of petitioners, and others similarly situated between the lines of embankment, and exposed to the full force of the currents of the river, with such increased and abnormal flood level.

"And are so raising, enlarging, strengthening, adding to and constructing such levees, as to cause the plantations of petitioners, and others so situated to be flooded annually by the waters of the river, and to destroy the crops, growing and grown thereon, and to drown the live stock, and to undermine and wash away the buildings, fences and other improvements, and to fill up the drains and ditches, and to wash off the soil, and to cover the lands with sand and gravel, and to render them unfit for cultivation, and to entirely destroy their value.

"4. That in pursuance of the said plan for the improvement of the navigation of the river, the said officers and agents of the United States have undertaken to close the Atchafalaya river, a natural outlet carrying off near one-third of the surplus waters of the Mississippi, and to force the waters of the Red river and its tributaries, from their natural course through the Atchafalaya river to the Gulf of Mexico, into the channel of the Mississippi river,

and have so obstructed, and are so obstructing, the passage of the surplus waters through the Atchafalaya as to cause the waters of the rivers at the flood stage to annually back up and overflow the lands of petitioners, and to destroy the crops, growing and grown thereon, and to deposit thereon superinduced additions of water, earth, sand and gravel, so as to render them unfit for cultivation, and to entirely destroy their value.

"5. That by reason of the premises aforesaid the lands of petitioners, which before, from their natural situation, were comparatively high and secure from overflow, have been flooded annually by the waters of the rivers thus confined, in the years 1890, 1891, 1892 and 1893, and the crops growing and grown thereon, have been each year destroyed by said overflows, so caused, and the live stock drowned, and buildings and fences and other improvements undermined and washed away, and the ditches and drains filled up and the soil washed off, and covered with sand, and earth and gravel, so as to render them unfit for cultivation, and to entirely destroy their value, to the injury and damage of petitioners, as follows, to-wit: . . ."

Following an enumeration of loss of crops and personal property in the years 1890, 1891, 1892 and 1893 and the fixing of the value of the land at $50,000, recovery was prayed of $107,257.50, asserted to be due because under the facts alleged there had been a taking of the property by the United States for public use.

A demurrer to this petition was overruled on June 1, 1896. The nature of the ruling is indicated by the following excerpt from the opinion, reported in 31 Ct. Cls. 318:

"The petition undoubtedly sets up losses which are in the nature of consequential damages, of which the court has not jurisdiction. The Government may have increased the effect of the flood wrongfully or rightfully by the erection of its levees; but it did not in the constitutional

sense of the term take the claimant's cotton, mules, corn, cattle, and sheep for public use. Such a claim is not founded on an implied contract; and of it the court has not jurisdiction. But the petition does allege that 'the value of the land and the improvements destroyed was $50,000;' and that taking is presented by allegations so closely resembling those in the *Pumpelly* v. *Green Bay Company. Case* that this court does not feel at liberty to say that they present no valid cause of action."

It is stated in the record that during the year 1908, first, second and third supplemental petitions were filed, although they are not reproduced; but the court below in its opinion declares the aggregate damages claimed was $569,702.50. To these petitions a demurrer seems to have been filed by the United States, which was passed upon in 1910, the order on the subject reading as follows:

"Within the former ruling in this case (31 Ct. Cls., 318), the demurrer to the original and supplemental petitions, in so far as they or either of them aver a taking of real estate—within six years from the date of filing of said petitions—by overflow proximately caused by the construction of levees or other public works in the improvement of the navigation of the Mississippi River pursuant to acts of Congress and within the ruling of the cases of *Pumpelly* v. *Green Bay Company* (13 Wall., 166) and *United States* v. *Lynah* (188 U. S., 445), is overruled.

But as to the alleged annual destruction of crops and personal property on said land so taken by overflow the demurrer is sustained."

Besides the supplemental petitions just referred to and the action of the court thereon in the period of sixteen years which elapsed between the entry of the order overruling the first demurrer in 1896 and January 5, 1912, when what is styled a fourth supplemental petition was filed, many proceedings were had, such as a hearing, the making of findings of fact and conclusions of law,

filing of motions to set aside the same, to amend the findings, etc, etc., none of which we need particularly refer to because in the first place, although mentioned, they are not reproduced in the record and in the second place, because we take it that the filing of the fourth supplemental petition was by permission of the court and with the consent of the United States, permitted for the purpose of restating the case of the claimants in its best possible aspect so that in the light of what had transpired a final disposition of the controversy might be had. We so conclude because there is not the slightest indication in the record of any objection having been made to the filing of the fourth amended petition and because obviously it had the significance which we attribute to it since the findings of fact which the court made the basis of the decree which is here under review in most important particulars, but copies and reproduces the allegations in the fourth supplemental petition. It becomes important therefore to exactly understand the issues presented by this petition before coming to consider and dispose of the case. And to this end, omitting all reference to averments relating to the mere description of the property involved or its value, we shall endeavor, not following the order of statement in the pleading, to accurately summarize its contents.

First. As to the situation of the lands, it was averred that said "lands are situated at Jackson Point, in the Alluvial Valley of the Mississippi, on the left bank of the river, 40 miles below Natchez and 25 miles above the mouth of Red River. That the basin in which the Jackson lands are situated commences at Ellis Cliffs, about 20 miles below Natchez, and extends to Fort Adams, about fifty miles below, with an average width of 2 miles and a maximum width of 6 miles, and is one of six (6) small basins of the Homochitto Basin," a description which beyond doubt, fixes the location of the lands as within

the minor basin lying between Ellis Cliffs and Fort Adams, the area and description of which as given in the recent report of the Mississippi River Commission we have before reproduced.

Second. As to the condition of the property prior to the doing of the acts complained of, it suffices to say that it was alleged that by means of levee protection resulting from work done by the owners of the property along the river bank, the property had been protected, that crops of large value had been raised thereon, and that improvements had been put thereon and that as a result of this protection by the levees built by the owners, although the property was occasionally overflowed by breaks in the levee, the overflow when it came was not destructive or of such long duration as to prevent the making of a crop, and that the property was highly improved, stocked with implements, etc., as alleged in the original petition, and was of great productive capacity and of large value to the owners.

Third. The facts from which it was alleged the property had been so injured or destroyed by work done by officers of the United States as to constitute a taking of the property by the United States for which adequate compensation was due, are stated under the following headings:

*a.* That about the year 1883 the officers and agents of the United States, "in pursuance of the Act of Congress creating the Mississippi River Commission, and of the subsequent acts for the improvement of the navigation of the Mississippi River, adopted the so-called Eads plan, by Act of Congress approved March 3, 1881, in consequence whereof have projected, and have constructed, and are constructing a continuous system of public works, for the purpose of so confining the flood waters of the river between lines of embankment, or levees, as to give increased elevation and velocity and force, to the currents, in order to scour and deepen the channel,

and have thus caused an increased and abnormal elevation
of at least nine feet to the waters of the river at the high
water or flood stage; and for said purpose have adopted
and made use of systems of public and private levees,
originally constructed for the reclamation of overflowed
lands, on the west bank from the highlands of Arkansas
to the mouth of the Red River, and from the mouth of
the Red River to the Passes. . . ."

b. That for time beyond the memory of man the flood
waters of the Mississippi River, passing Helena, Arkansas,
where the highlands abut on the river, had escaped into
the White River and Upper Tensas Basins, and passed
in part through various designated bayous, rivers or
streams which as we have previously said in describing
the White River and Tensas basins on the west bank
carried to the Gulf independently of the Mississippi
waters which enter into or overflow these great water-
sheds. It being moreover, however, alleged that if they—
that is, the waters passing Helena and which did not
escape into the White River and Tensas Basins—"ever
reached the lands of claimants in sufficient volume to
flow them were speedily reduced by crevasses on the west
bank, which allowed them to escape into the Atchafalaya
Basin, and thus relieved the lands of claimants."

That in executing their plans as above described the
officers of the United States had by the levees which they
had constructed or maintained along the front of the
White River and Tensas Basins, prevented the flow of a
large volume of water into those basins which would
have found its way to the Gulf without returning to the
Mississippi as above stated, and had thus increased largely
the volume of water flowing past the claimants' land
and which therefore in time of flood would rest against
the levee which protected their lands from overflow.

c. That for the purpose of carrying out their plans,
the officers had built a levee to close a very extensive

break or crevasse in the levees on the west bank opposite to, or nearly so to the lands of the claimants on the east bank, known as the Bougere Crevasse, which carried off a great volume of water and relieved the pressure on the claimants' levee and thus additionally by retaining such water in the river augmenting the risk of overflow by increasing the danger of a break in the levees of claimants.

*d.* Because yet further to give effect to their plans, the officers of the United States had prevented large quantities of water which otherwise would have reached the Gulf through the Atchafalaya river, from taking that course, by works designed to retain water in the Mississippi, thus causing the water to back up against claimants' levee, and greatly increasing the danger of overflow.

*e.* That the plantations of petitioners are located within the limits of a narrow strip of land lying between the low water bank of the Mississippi River and the highlands east of it between Vicksburg and Baton Rouge, where the highlands skirt very closely to the river bank and are not protected by levee construction other than that built by the claimants, which has been destroyed and washed away by the recent flood waters of said river after the levee system had practically reached a state of completion and the United States had closed the Bougere Crevasse, as hereinafter alleged.

"That the United States has not attempted to connect the levee line on the east side of said river by the construction of levees on said irregular and narrow strip of land lying between Vicksburg and Baton Rouge for the reason that the cost of said levee construction, as shown by the Mississippi River Commission's Report for 1896, and the report and survey of the small basins in the Homochitto levee district between Ellis Cliff and Fort Adams, made in 1895 by Col. Geo. B. McC. Derby, the engineer officer in charge of said district, would exceed the value of the land lying between the river and the foothills, (of which

petitioners' lands are a part), to the amount of $206,500.00, it being more economical to use the foothills as levees, as now being done, and pay for the land destroyed, than to build levees on the east bank of said river between said city of Vicksburg and the city of Baton Rouge. That the Mississippi River Commission, in its report for the year 1910, in part says that the lands of petitioners are now subject to perpetual inundation."

The court below made elaborate findings of fact, contained in twenty-five numbered paragraphs. The first four relate to the title of the claimants to the land and we need not review them. Findings 5, 6, 7, 8, and 9 relate to the condition of the river prior to the work done by the Government, to the escaping of water into the White River and Tensas Basins as alleged, and to the increased pressure brought upon the levees protecting the lands of the claimants, to the greater frequency of overflow of such lands, etc., etc., some of these findings as we have said, being in the very words of the allegations of the supplemental and amended petition of 1912. Concerning the work done by the officers of the United States, findings numbered 10, 11 and 15 contain the following:

"X.

"Prior to the year 1883 the States and local authorities had constructed unconnected lines of levees for the protection and reclamation of lands subject to overflow from the mouth of Red River to the mouth of Arkansas and from the mouth of the Yazoo to the highlands below Memphis. The flood waters of 1882 destroyed miles of these levees.

"Beginning about the year 1883 and continuing to the present time, the officers and agents of the United States, pursuant to an act of Congress creating the Mississippi River Commission and the other acts amendatory thereof, and for the improvement of the Mississippi River for navigation, adopted a plan, the so-called Eads plan,

and in consequence thereof have projected and constructed and maintain—and are now engaged in constructing and maintaining certain lines of levees on both sides of the river at various places for various distances from Cairo, Ill., to near the Head of the Passes, a distance of 1,050 miles by river from Cairo, and the local authorities or organizations of the States bordering along the river on both sides from Cairo to the Gulf have before and since 1883 constructed and are now constructing and maintaining certain lines of levees at various places and of various lengths for the purpose of protecting and reclaiming lands within their respective districts from overflow in times of high water.

"The levee lines so constructed by the United States and local authorities have been joined, thus giving a continuous line of levees, as contemplated by the Eads plan, with the result that the flood waters of the Mississippi River to a great extent are confined within and between said levee lines and encompassed within a narrower scope than heretofore, acquired an increased velocity and higher elevation and the current thereof has become stronger and more forceful.

"The plan of the officers and agents of the United States so acting was to increase said velocity and scouring power of the water and to scour and deepen the channel of the Mississippi River and thereby improve it for navigation, and the purpose of the officers and agents of the State and local authorities constructing lines of levees at various points along and on both sides of the river was to reclaim and to protect land from overflow in times of high water. By so doing, the waters being thus confined within a narrower compass, as above indicated, have attained a higher elevation of approximately 6 feet in times of high water.

"XI.

"From Cairo, Ill., to near the mouth of the Yazoo River, just north of Vicksburg, the Mississippi River is practically

leveed on both sides, except on the east side, where the highlands abut on or near the river in Kentucky and Tennessee (from Port Jefferson, Ky., to a short distance south of Memphis, Tenn.) and thence on the west side to near the Head of the Passes, or to a point 1,050 miles by the river from Cairo, and on the east side from Baton Rouge to the same point near the Head of the Passes, leaving a gap in the line of levees of 234 miles in length, from the mouth of the Yazoo River to Baton Rouge, unleveed, where the foothills in some places hug closely to the east bank of the river, and at other points are from 2 to 6 miles from the river, in which strip of territory the lands of claimants are located between the highlands and the river, as before stated.

"The extension of the general levee system by the United States and the local authorities, since the United States adopted to its use and assumed 'permanent control' of the levees theretofore constructed by State and local authorities, has resulted in an increased elevation of the general flood levels, which subjects the claimants' lands to deeper overflow than they were subject to formerly, or would be subject to now, if the levee system were not in existence, and consequently has destroyed its value for agricultural and grazing purposes, causing its abandonment for that purpose since the year 1908. The immediate cause of the deeper overflow of claimants' land is the increased elevation of flood heights which is the result of the general confinement of the flood discharge by the levee system as a whole.

## "XV.

"Before the creation of the Mississippi River Commission by act of Congress, and the adoption of the Eads plan as aforesaid, the levee lines along the Mississippi River theretofore constructed by State and local authorities consisted of a broken chain of levees of insufficient height and strength to confine the flood waters, and had

been built without regard to a uniform grade line. The United States then caused a survey and report to be made by its officers and agents showing the condition and location of levee lines theretofore constructed by State and local authorities as they then existed. This survey suggested a proposed continuous system of levees from Cairo to the Head of the Passes. In many instances it was a blanket survey which encompassed and took in the lines of levees theretofore constructed by State and local authorities as above stated. The project recommended by the Mississippi River Commission adopting the Eads plan for the systematic improvement of the river from Cairo to the Head of the Passes was practically adopted by act of Congress approved March 3, 1881. The United States then undertook the projection and completion of a continuous line of levees from Cairo to the Head of the Passes, as suggested by this survey and the Eads plan, and as recommended by the Mississippi River Commission, and, in furtherance of that plan and as part of and supplementary thereto, adopted to its use, and is now using, the levees theretofore constructed by State and local authorities, thereafter making them much larger and stronger. Since that time, levee construction, whether done by the United States or State and local authorities, has been in conformity with the grades and methods of construction adopted by the Mississippi River Commission, and the efficiency of the levee system has been largely due to this fact.

"The extension of this levee system by the United States from Cape Girardeau, Mo., to the Head of the Passes was authorized by act of Congress in 1906." (34 Stats. 208.)

The remainder of the findings are but cumulative and we do not pause to state them.

The court concluded in view of the authority of the United States over navigation and its right to construct works for that purpose, that there was no liability on the

part of the Untied States, basing its views on this subject upon *Bedford* v. *United States*, 192 U. S. 217, 225. The petition was therefore dismissed.

Before we take up the contentions advanced by the appellants to establish that the court below was wrong in deciding that there was no liability on the part of the United States, we consider it necessary, lest misconception otherwise might result, to refer to what we deem to be grave errors committed by the court in certain particulars, even although in passing upon the merits we shall consider the case in such an aspect as to cause it to be unnecessary to review the errors in question for the purpose of passing on the merits. In the first place it is apparent that in many important respects matters which the court below has stated as findings of fact are mere conclusions of law. This is true for instance of the broad conclusion embodied in the findings of fact as to the relation of the United States to levee work and the power of the Mississippi River Commission over all such work by whomsoever performed. In the second place, treating it as a question of law, we think the error is apparent from a consideration of the statutes and the official reports relating to the subject, which we may judicially notice. It is true indeed that when the Eads theory, illustrated by the successful jettying of the mouth of the river under a contract made with Captain Eads, came to be understood and it also came to be appreciated that the most efficient way to improve the navigation of the river was to ultilize the vast power of the river, by confining its waters within its banks, thus directing its energies to cutting out a deeper channel, Congress legislated to the accomplishment of such result by the creation of the Mississippi River Commission, and by conferring the power upon that body to improve the navigation of the river and to build levees for that purpose with the appropriations which were made from time to time to carry out these great purposes. But nothing in

that legislation justifies the conclusion that, irrespective of navigation, Congress assumed control of the entire work of protection from overflow by levees, to the displacement of the state or local authorities. On the contrary, the reports of the Commission and the public documents and history connected with the same leave no room to doubt that as necessarily the levees built by the United States in aid of navigation at the same time afforded protection from overflow and thus served a twofold purpose that thereby renewed energy was stimulated in state and local authorities to undertake the work of building levees for protection, so that one continuous and complete system of protection would be evolved. It is of course true, also, that the intelligent work of the Mississippi River Commission furnished a standard which served in a sense to control and direct the coöperating energies of others. The gravity of the error, as expressed in the findings of the court below, is illustrated by the fact that it treated the injury alleged to have been suffered as arising alone from the acts of the United States, when in truth, if there was such injury, it could only have resulted from the concurrent action of the United States, the States and their subordinate agencies, including individuals, all acting to the realization of a common end, that is, an efficient and continuous line of levees, although action was impelled by different considerations. This is illustrated by the statement made by the Mississippi River Commission in its annual report for 1894, pp. 2713–2715, where, in referring either to the claim of damage made in this case or to one like it, it was said:

"The injury will not be traceable to levees built by the United States any more than to those built by the States and local organizations. Neither can it be attributed to the levees on any particular or limited portions of the river. It will be a result of the system as a whole."

But passing, for the sake of argument, these considera-

tions, let us look at the case in the light of the findings as made.

It is apparent, taking the broadest possible view in favor of the claimants, that the grievance which they allege they have suffered, can only rest upon three grounds:

1st. The building by the officers of the United States of lines of levees along the bank of the river for the purpose of retaining the water in the river, treating, for the sake of the argument, all acts done by the local authorities in building levees or closing breaks as acts of the United States.

2nd. The failure of the United States to build on the east bank of the river along the minor basins which we have fully described, a line of levees so as to afford means of protection from the increased danger of overflow arising from the fact that the lines of levees along the river on the west bank and elsewhere had been raised and strengthened and extended, thus at least beyond doubt temporarily increasing the level of the flood in times of high water.

3rd. The performance of work by the United States tending to diminish the outflow of water from the river through streams which flowed from it, to the end that a more efficient body of water might remain in the stream for the purpose of accomplishing the deepening of the channel and thus more effectively improving the navigable capacity of the river.

Let us primarily test the merits of the first ground of complaint, that is, the building of levees. It is not averred that the land of the claimants bordering on the east bank of the river in the absence of all levees and in a state of nature would not in seasons of high water, be overflowed; and if it had been so alleged it is certain there would be no right on the part of an individual to insist that primitive conditions be suffered to remain and thus all progress and development be rendered impossible. When accurately

fixed, the complaint is but this, that because the claimants had built a levee for the purpose of protecting their lands and which answered that purpose if levees were not built by others to protect their lands, actionable injury would be occasioned claimants when anybody else sought to protect his land from overflow, since to so do would increase the volume of water in the river and raise the flood level to the detriment of claimants. In its essence, however, this but amounts to saying that because the claimants have built a levee along their property for the purpose of protecting it from overflow in times of high water, they have acquired the right to stereotype the conditions existing at the time they built their levee even to the extent of preventing any one from subsequently exerting his right to build a levee to protect his land. Nothing could more completely illustrate the accuracy of this statement than the averments in the supplemental petition concerning the closing of the Bougere Crevasse, since those averments in their last analysis but charge that there was a right on the part of the claimants to subject a vast area of country on the west bank to the devastation resulting from the existence of so extensive a crevasse, simply because to close it would subject the levee of claimants across the river, to a greater pressure consequent on the retaining of the flood water of the river within its banks. And indeed a like illustration is afforded by the averments as to the escape of water from the river on the west bank, and the spread of that water through the White River and Tensas Basins until it ultimately reached the Gulf, by emptying into remote streams. To make the demonstration, if possible, clearer, let us suppose that by the acts of individuals for their own protection sanctioned by the local laws, a complete line of levees had been built accomplishing the very result which it is insisted brought about the injury here complained of. Would it be said that the claimants would have a resulting right of action in damages because

other owners had exerted the very right which the claim-
ants had previously resorted to for the purpose of pro-
tecting their own land? If not, upon what imaginary
ground can it be said that because a work which was lawful
in and of itself, was done by the United States, therefore
responsibility in favor of the claimants was entailed. ,

Coming to the second contention, we think it is disposed
of by the following considerations:

In the first place—by the report of the Commission to
which we have referred the impossibility was pointed out
of building a levee along the line of the minor basin in
which the land of claimants is situated, without destroying
said land, because of its peculiar situation, unless there was
a permanent system of pumping to take out the water
which would gather in the watershed.  In the second place
—looked at from the point of individual right and corre-
sponding responsibility, it is impossible to conceive by
what principle it can be said that because an individual
having a right to do so has built a levee to protect his land
from overflow, and because his levee has accomplished that
result by retaining the water in the river, that thereby
there arose a duty on his part to build a levee to protect
the land of another or in the alternative to pay for such
land.

Indeed, the propositions but assert on the one hand that
the United States is liable because it did that which it had
a right to do and on the other that it is liable because it
abstained from doing that which it was under no duty to
do.  Both the fundamental errors which the contentions
involve are exemplified in the arguments used to sustain
them since, it is urged that because the levees constructed
on the bank of the river operated to keep the water in the
river from flowing out, that thereby they served to bring
water into the river from without, and that the mere ab-
stention from building levees at a particular place or on
a particular line operated to transfer the bank of the river

over to the foot of the hills or to move the hills over to the river so as to cause them to become its banks.

The third consideration, that is, the preventing of the outflow of water by work done in the tributaries and the consequent increase in the volume of water in the river, cannot be tested from the point of view of individual authority, as the power to so do involves necessarily the exercise of governmental power. We therefore come to consider the proposition in that aspect. In doing so, however, it is to be observed that even if all the previous considerations which we have stated concerning the non-liability to result from building levees, measured by the right of an individual to build a levee to prevent the water of a river from overflowing its banks and destroying his property, be put out of view, and the case therefore in all its aspects be tested by the scope of the governmental authority possessed by the United States, the absence of merit in all the claims is too clear to require anything but statement. We say this because the plenary power of the United States to legislate for the benefit of navigation and to construct such works as are appropriate to that end, without liability, for remote or consequential damages, has been so often decided as to cause the subject not to be open. It was directly ruled as to work done by the Mississippi River Commission in *Bedford* v. *United States,* 192 U. S. 217, 225, upon the authority of which case, as we have said, the court below placed its ruling, and as the underlying principles which controlled the decision in the *Bedford Case* and which govern the subject were again at this term with much elaboration stated and applied, we think it unnecessary to do more than refer to that ruling (*United States* v. *Chandler-Dunbar Water Power Co.,* 229 U. S. 53), and to direct that the judgment below be

*Affirmed.*