## FRANKLIN v. UNITED STATES.
## GRAVES v. SAME.
### Nos. 4247, 4248.

District Court, W. D. Tennessee, W. D.

Aug. 31, 1936.

Costen & Crabtree, of Memphis, Tenn., for plaintiffs.

R. G. Draper, Asst. U. S. Atty., of Memphis, Tenn., for the United States.

MARTIN, District Judge.

These cases are before the court on demurrers of the United States to the declarations filed by the plaintiffs. Each of the plaintiffs own undivided one-fourth interests in a certain piece of land containing eleven hundred acres and located on the east bank of the Mississippi river in Tipton county, Tenn. Plaintiffs allege that, for more than twenty-five years prior to the injury complained of, their land was rich, fertile, well-drained, highly cultivated and

highly productive, and that its elevation was such that the waters of the Mississippi river did not hinder or prevent its full and complete use as farming property; and that each and every year valuable crops of cotton and other crops were produced upon said land. Plaintiffs aver that, because of its location, fertility, drainage and freedom from crop destruction by the flood waters of the Mississippi river, their said land, prior to the operations of the United States complained of, had a reasonable market value of more than $100 per acre.

The declaration avers that the Mississippi River Flood Control Act of Congress, enacted May 15, 1928, 45 Stat. 534, (33 U.S.C.A. §§ 702a to 702m) in section 702a, 33 U.S.C.A., provides, inter alia, for flood control of the Mississippi river in its alluvial valley, and for its improvement from the Head of Passes to Cape Girardeau, Mo. (in which area the land of plaintiffs was situated) in accordance with the engineering plan set forth and recommended in the report submitted by the Chief of Engineers to the Secretary of War, dated December 1, 1927, and printed in House Document 90. The sum of $325,-000,000 was by said section of said act appropriated for the aforesaid purpose, and the unexpended balances of appropriations made by former laws for the flood control work and improvement on the Mississippi river were made available for expenditure.

It is pleaded in the declaration that section 702b, 33 U.S.C.A., asserts that the flood control contemplated by the act is a national concern, and is in the interest of national prosperity, the flow of interstate commerce, and the movement of United States mails; and it is alleged that the engineering plan adopted and approved by the act includes not only the construction of levees along the Mississippi river, but all work having for its purpose improvement of the navigation of said river, such as dredging and building of dykes. The declaration stresses section 702c, 33 U.S.C.A., section 3 of said act in respect to the following language contained therein: "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place; Provided, however, That if in carrying out the purposes of sections 702a to 702m of this title it shall be found that upon any stretch of the banks of the Mississippi River it is impracticable to construct levees, either because such construction is not economically justified or because such construction would unreasonably restrict the flood channel, and lands in such stretch of the river are subjected to overflow and damage which are not now overflowed or damaged by reason of the construction of levees on the opposite banks of the river it shall be the duty of the Secretary of War and the Chief of Engineers to institute proceedings on behalf of the United States Government to acquire either the absolute ownership of the lands so subjected to overflow and damage or floodage rights over such lands."

The plaintiffs aver that, pursuant to and acting under authority of said Act of Congress, the United States of America, through its duly authorized agents and agencies, the Mississippi River Commission and United States Army Engineers, did in 1931, authorize and begin the construction of certain dykes in the Mississippi River, a short distance above and opposite the lands of the plaintiffs and upon the opposite or Arkansas side of the Mississippi river.

The declaration charges the liability of the United States of America to the plaintiffs, in haec verba:

"Said dykes are permanent and were constructed by the driving of two rows of piling, parallel and close together, bound together with steel cable and filled between with crushed rock, and the character of the dyke is such as to effect a complete and permanent obstruction of the flow of the water in the Mississippi River. They extend out into the river practically at right angles with and from the Arkansas or west bank of said river, and from 1300 to 4000 feet into the bed of the Mississippi River. They are so built as to extend above the surface of the water at any ordinary stage. A map is attached hereto showing the location of and the length of said dykes with relation to the bed of said river and the land of plaintiff, and is marked Exhibit 'A' and made a part of this declaration.

"Prior to the construction of said dykes, the current of said river opposite the lands of plaintiff was, because of the course of the river above, opposite and below same, distinctly and permanently away from and not against the Tennessee bank where said lands lay, and would have remained so but for the acts herein complained of.

"The purpose of the construction of said dykes was to force the current of said river away from its natural course, almost at a right angle across the river, and against

the bank on the Tennessee side where said lands lay. The purpose of changing the current of said river was to force the channel of commerce at said point upon the Tennessee side to improve navigation. The direct effect of the construction of said dykes was to change the current of the river, theretofore away from and not against said land, and to direct and force violent and destructive current directly against the said Tennessee bank where said lands lay, and as a result thereof, within one year after the completion of said dykes, all but a few acres of said land was entirely and permanently washed away, and the location where it formerly lay, became the bed and channel of commerce of the Mississippi River. The result of said acts of defendant, its servants and agents in the construction of said dykes, directing said current against and washing away plaintiff's said land, was an intentional direct invasion of and complete destruction of said property of plaintiff.

"It was impracticable and not economically justifiable to construct levees to protect said lands, and said land prior to the construction of said dykes, was not overflowed and damaged by reason of the construction of levees, on the opposite side of the river. The construction of said dykes raised the water and caused same to overflow, damage and destroy these lands.

"No compensation has been paid or provided to be paid to plaintiff or anyone else for the taking, appropriation and destruction of plaintiff's said lands, or an easement thereon by defendant for the aforesaid purposes, nor have any proceedings been instituted by the Secretary of War and the Chief of Engineers on behalf of the United States Government, whether pursuant to provisions of said section 702c of the Flood Control Act, or pursuant to provisions of any other Federal Statute or law, to acquire absolute ownership of said lands so subjected to invasion, damage and destruction, or floodage rights over such lands.

"Said dykes are permanent, have completely destroyed the lands of plaintiff and the improvement thereon, and have deprived plaintiff of any further use or profit from same. The destruction of said lands was a direct and proximate result of the construction of said dykes, was inevitable and that such result would occur was well known to defendant and its duly authorized agents and agencies at the time said dykes were constructed. This destruction would not have occurred but for the acts herein complained of.

"The construction of said dykes by defendant, through its duly authorized officers and agents, by authority of said Act of Congress, constituted and was a taking or appropriation of plaintiff's said lands or of an easement thereon for the aforesaid public uses and purposes within the scope and meaning of the Fifth Amendment to the Constitution of the United States which provides that private property shall not be taken for public use without just compensation, and by reason of the premises, plaintiff has a claim against defendant under an implied contract for the value of property so taken and appropriated by it for said public uses and purposes.

"The construction of said dykes has not resulted and will not result in any benefit to the aforesaid lands of plaintiff.

"The value of plaintiff's said lands at the time of the aforesaid appropriation and taking thereof by defendant was in the sum of $75,000.00, and the value thereof after said appropriation and taking was nothing, and by reason of the premises, plaintiff is entitled to just compensation from defendant, and defendant is indebted to him in the sum of $10,000.00, with interest thereon at the rate of 6% per annum from the date of such taking and appropriation."

The demurrers of the United States of America state four grounds: (1) That the respective plaintiffs are not entitled to recover in their separate actions, for the reason that each is the owner of only an undivided one-fourth interest in the certain piece of land alleged to have been damaged or destroyed, and that an action of this character must be instituted by or in behalf of the joint owners of the unit or piece of land alleged to have been damaged, and that the maximum amount of recovery is $10,000 for all claims of damage to said 1100-acre "piece of land"; (2) that defendant is not liable to plaintiffs because the alleged damage or destruction of the land of plaintiff was not a "taking" of said land by the United States, but was of a consequential nature resulting, as alleged, by plaintiffs, from work done by the government to improve navigation; (3) that the defendant is not liable, for the reason that, under the provisions of the Flood Control Act of Congress of May 15, 1928, no liability attaches to the United States except in cases where lands are subjected to over-

flow by reason of the construction of levees on the opposite banks of the river, whereas the declaration shows the alleged damage sustained by plaintiffs to have resulted from the construction of dykes; (4) that the plaintiffs cannot recover because this action is a tort action, not permitted to be maintained against the United States by Acts of the Congress.

Final decision on these demurrers has been a difficult problem for this court. The arguments of counsel on both sides of the controversy have been exceptionally strong and the series of elucidating briefs submitted have been most helpful, and have been considered with much care and deliberation. The conclusion has been reached that the second ground of the demurrers of the United States should be sustained. It, therefore, becomes unnecessary to comment upon the other counts of the demurrers; except to say that the third and fourth grounds of the demurrers, in consequence of the ruling on the second ground, are sustained also, because the third ground of the demurrers correctly construes the Flood Control Act of Congress of May 15, 1928, and the fourth ground applies the recognized principle that an action of tort cannot be maintained against the United States, and, therefore, there can be no recovery herein on the facts alleged in the declaration or any theory of tort. In view of the decision of the court, sustaining the demurrers as stated, it is unnecessary to pass upon the first ground of the demurrers.

The basis of the decision that the United States is not liable to the plaintiffs on the facts alleged in their declaration is found in the opinions of the Supreme Court of the United States. Beginning with Gibson v. United States (1897) 166 U.S. 269, 17 S.Ct. 578, 41 L.Ed. 996, these decisions will be reviewed.

In the case mentioned, which was an action to recover damages because of the construction of a dyke by the United States in the Ohio river, the Supreme Court held that riparian ownership on navigable waters is subject to the obligation to suffer the consequences of an improvement of the navigation, under an Act of Congress, passed in the exercise of the dominant right of the government in that regard; and damages resulting from the prosecution of such an improvement cannot be recovered in the Court of Claims.

In the Gibson Case, the Court of Claims (29 Ct.Cl. 18) found as a matter of fact that the construction of the dyke by the United States had substantially destroyed claimant's landing, preventing free egress and ingress to products from and supplies to her farm during the greater part of the gardening season, but that the dyke had not come into physical contact with claimant's land, or caused physical contact in any other way; and that no water had been thrown back on claimant's land by the building of the dyke. Chief Justice Fuller, in delivering the opinion of the court, said (166 U.S. 269, at page 275, 17 S.Ct. 578, 580, 41 L.Ed. 996): "The fifth amendment to the constitution of the United States provides that private property shall not 'be taken for public use without just compensation.' Here, however, the damage of which Mrs. Gibson complained was not the result of the taking of any part of her property, whether upland or submerged, or a direct invasion thereof, but the incidental consequence of the lawful and proper exercise of a governmental power."

The Chief Justice quoted with approval the language of Mr. Justice Strong in Northern Transportation Co. v. Chicago, 99 U.S. 635, 642, 25 L.Ed. 336: "But acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision. They do not entitle the owner of such property to compensation from the State or its agents, or give him any right of action. This is supported by an immense weight of authority."

Next in order of time sequence among the Supreme Court authorities comes United States v. Lynah (1903) 188 U.S. 445, 23 S.Ct. 349, 351, 47 L.Ed. 539, urgently presented by counsel for plaintiffs in support of their contention that the facts alleged in their declarations constitute a "taking" of their land within the scope of the protection of the Fifth Amendment.

From the findings of fact in the Lynah Case, it appears that in the improvement of the navigation of the Savannah river the government built and maintained in and across the said river and in its bed certain dams, training walls and other obstructions, obstructing the natural flow of the river along its natural bed, and so raising the

level of the river above the obstruction as to cause its waters to be kept back and to flow back and be elevated above the natural height of the river in its natural bed. The pertinent finding of fact seems to be: "X. By the raising of the level of the Savannah river by these dams and obstructions, the water thereof has been backed up against the embankment on the river and has been caused to flow back upon and in this plantation [owned by plaintiff] above the obstruction, and has actually invaded said plantation, directly raising the water in said plantation about 18 inches, which it is impossible to remove from said plantation. This flooding is the permanent condition now, and the rice plantation is thereby practically destroyed for the purpose of rice culture or any other known agriculture, and is an irreclaimable bog and has no value."

On these facts, the material difference is that in the Lynah Case, dams and obstructions built in the river threw the water back upon a plantation above the obstruction and constituted an invasion of the plantation; while in the case at bar, the construction of the dykes merely forced the current of the river away from its natural course to improve navigation, and, thereby, damaged the land of the owner on the shore opposite or below the bank on which the dyke was constructed; and riparian ownership is subject to the consequences of the improvement in navigation as announced in the Gibson Case, supra. The building of dams, walls, and obstructions in a river in the manner described in the Lynah Case is broadly distinguishable from the construction of dykes as described in the declarations of plaintiffs. On the plainly distinguishable facts of the case, it is deemed irrelevant here that the Supreme Court held in United States v. Lynah, supra, that where the government of the United States by the construction of a dam, or other public works, so floods lands belonging to an individual as to totally destroy its value, there is a taking of private property within the scope of the Fifth Amendment.

This interpretation seems clearly necessary, in view of the fact that in less than a year following the decision in the Lynah Case, the Supreme Court of the United States decided, in Bedford v. United States (1904) 192 U.S. 217, 24 S.Ct. 238, 48 L.Ed. 414, that damages to land by flooding as the result of revetments erected by the United States along the banks of the Mississippi

river to prevent erosion of the banks from natural causes are consequential and do not constitute a taking of the lands flooded within the meaning of the Fifth Amendment to the Federal Constitution.

In the Bedford Case, the court followed Gibson v. United States, 166 U.S. 269, 17 S.Ct. 578, 41 L.Ed. 996, supra, and distinguished United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539, supra, in these words (192 U.S. 217, at page 225, 24 S.Ct. 238, 240, 48 L.Ed. 414) : "In the case at bar the damage was strictly consequential. It was the result of the action of the river through a course of years. The case at bar, therefore, is distinguishable from the Lynah Case in the cause and manner of the injury. In the Lynah Case the works were constructed in the bed of the river, obstructed the natural flow of its water, and were held to have caused, as a direct consequence, the overflow of Lynah's plantation. In the case at bar the works were constructed along the banks of the river, and their effect was to resist erosion of the banks by the waters of the river. There was no other interference with natural conditions. Therefore, the damage to appellants' land, if it can be assigned to the works at all, was but an incidental consequence of them."

Excerpts from the findings of fact of the Court of Claims (36 Ct.Cl. 474) in the Bedford Case point the pertinency of this decision in consideration of the facts in the case at bar. It appears that:

"The revetment consisted of willow mattresses weighted down by stones, and were placed on said banks below high-water mark. The revetment was neither upon nor in contact with the claimants' lands. * *

"In making the improvement aforesaid the defendants did not recognize any right of property in the claimants in and to the right alleged to be affected, and did not assume to take private property in and by the construction of the revetment, but proceeded in the exercise of a claimed right to improve the navigation of the river.

"After * * * the construction of the revetment, as aforesaid, the channel and current of the Mississippi River were [gradually] directed [toward] the lands of the claimants, situated about 6 miles below said cut-off [and did about the year 1882, reach said lands and thereafter erode and overflow about twenty three hundred acres of their land which overflow has ever since continued]. * * * The injury done to

258

the claimants' land was an effect of natural causes; the injury caused by the Government was by interrupting the further progress of natural causes, i. e., the further change in the course of the river, and is also conjectural."

The Court of Claims denied recovery, and the Supreme Court of the United States affirmed the judgment. The Supreme Court said (192 U.S. 217, at page 223, 24 S.Ct. 238, 48 L.Ed. 414): "The contention [of the plaintiff] asserts a right in a riparian proprietor to the unrestrained operation of natural causes, and that works of the government which resist or disturb those causes, if injury result to riparian owners, have the effect of taking private property for public uses within the meaning of the 5th Amendment of the Constitution of the United States. The consequences of the contention immediately challenge its soundness. What is its limit? Is only the government so restrained? Why not as well riparian proprietors, are they also forbidden to resist natural causes, whatever devastation by floods or erosion threaten their property? Why, for instance, would not, under the principle asserted, the appellants have had a cause of action against the owner of the land at the cut-off if he had constructed the revetment? And if the government is responsible to one land owner below the works, why not to all land owners? The principle contended for seems necessarily wrong. Asserting the rights of riparian property, it might make that property valueless. Conceding the power of the government over navigable rivers, it would make that power impossible of exercise, or would prevent its exercise by the dread of an immeasurable responsibility."

United States v. Grizzard (1911) 219 U.S. 180, 31 S.Ct. 162, 55 L.Ed. 165, 31 L. R.A.(N.S.) 1135, is not in point, for the reason that a part of the plaintiff's land had been actually taken and the Supreme Court merely held that the compensation to be awarded under the Fifth Amendment for an actual physical taking of a part of a distinct tract of land includes not only the market value of the part appropriated, but the damage to the remainder of the tract resulting from such taking, embracing injury due to the use to which the part appropriated is to be devoted.

In the case at bar, there was certainly no actual physical taking of any part of the land of the plaintiffs.

■ When the decisions of the Supreme Court heretofore discussed, and those hereinafter distinguished, are analyzed and understood, Jackson v. United States (1913) 230 U.S. 1, 33 S.Ct. 1011, 57 L.Ed. 1363, seems to be the really determinative authority on the proposition before this court.

The Supreme Court squarely held that the United States is not responsible for damages by overflow, or for failure to construct additional levees along the Mississippi River Valley, so as to afford increased protection from increased overflow caused by the levees that were constructed by state and federal authority at other points; nor do such damages amount to taking the land overflowed for public use within the meaning of the Fifth Amendment.

■ The court held, also, that in Bedford v. United States, supra, the rule that the United States has plenary power to legislate for the benefit of navigation and is not liable for remote or consequential damages caused by works constructed to that end has been already applied to the work of the Mississippi River Commission. The rule is with equally logical force applicable to government operation under the Mississippi River Flood Control Act of May 15, 1928.

Under the principle applied in the Jackson Case, the United States government would apparently have a clear right to construct a dyke in the navigable Mississippi river for the purpose of preserving the channel and aiding navigation, with the same immunity from liability recognized and granted in the unanimous opinion of the Supreme Court pronounced after exhaustive consideration by Chief Justice White.

Hughes v. United States, 230 U.S. 24, 33 S.Ct. 1019, 57 L.Ed. 1374, 46 L.R.A.(N. S.) 624, and Cubbins v. Mississippi River Commission, 241 U.S. 351, 36 S.Ct. 671, 60 L.Ed. 1041, follow with approval the principle laid down in the Jackson Case.

United States v. Archer (1916) 241 U.S. 119, 36 S.Ct. 521, 60 L.Ed. 918, is urged by counsel for plaintiffs as authority for their position, because ultimate recovery was allowed for damages flowing from the construction of a dyke. The case can have no weight here because of its materially distinguishable facts. The plaintiff was the owner of a plantation on the Mississippi river. The United States constructed a dyke across plaintiff's land and appropriat-

ed a part of the soil, to wit, 31⁹⁄₁₀ acres by actual occupation, and rendered the remainder of the tract, to wit, 3664.6 acres, unfit for cultivation or other profitable use. The Supreme Court reversed the judgment for $83,920, rendered in favor of plaintiff by the Court of Claims, and remanded the cause with the query whether the liability to the owner of a tract of land, part of which was taken for erection of a dyke in a navigable river, is limited to compensation for the area actually occupied by the dyke itself under Bedford v. United States, 192 U.S. 217, 24 S.Ct. 238, 48 L.Ed. 414, and Jackson v. United States, 230 U.S. 1, 33 S.Ct. 1011, 57 L.Ed. 1363, or includes compensation for the remainder of the tract destroyed by the deflection upon it of waters of the river by reason of the construction and maintenance of the dyke under United States v. Grizzard, 219 U.S. 180, 31 S.Ct. 162, 55 L.Ed. 165, 31 L.R.A.(N.S.) 1135. It thus plainly appears that in the Archer Case, there was an actual taking of a part of plaintiff's land by occupancy and use.

On retrial in the Court of Claims, 53 Ct.Cl. 405, further findings of fact were made and a recovery allowed only for the 31.4 acres of land which had been actually taken and appropriated for the construction of the dyke and for certain other land lying between the dyke and the river. The Court of Claims said that, "The Government having taken part of plaintiffs' land, and the structure erected thereon having contributed to the damage of another part of the land, we have concluded to give judgment for that damage under the influence of the Grizzard Case, 219 U.S. 180 [31 S.Ct. 162, 55 L.Ed. 165, 31 L.R.A.(N. S.) 1135]." Doubt was expressed as to the propriety of this last allowance. Both parties appealed, and the judgment was affirmed in a per curiam opinion by an equally divided court. Archer, Adm'x, v. U. S. (U. S. v. Archer), 251 U.S. 548, 40 S. Ct. 342, 64 L.Ed. 409.

Heavy dependence is placed by counsel for plaintiffs upon United States v. Cress (1917) 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746. In this case, in improving the navigation of the Cumberland river in Kentucky, under the commerce power, the federal government by means of a lock and dam raised the water above the natural level so that lands on a nonnavigable tributary, not normally invaded thereby, were subjected permanently to periodical overflows substantially injuring, though not destroying,

their value. In an action for damages under the Tucker Act (28 U.S.C.A. § 41 (20), the Supreme Court held that this amounted to a partial taking of the property and that the United States was liable, ex contractu, to compensate the owner of land to the extent of his injury.

The salient difference between the facts of the instant case and those upon which the court passed in the Cress Case appears in the opinion of the court (243 U.S. 316, at page 326, 37 S.Ct. 380, 384, 61 L.Ed. 746) : "The findings make it clear that the dams in question, constructed by the government in the Cumberland and Kentucky rivers, respectively, are for raising the level of those streams along certain stretches by means of back water, so as to render them, to the extent of the raising, artificial canals instead of natural waterways."

And again (243 U.S. 316, at page 327, 37 S.Ct. 380, 385, 61 L.Ed. 746) : "The findings, however, render it plain that this is not a case of temporary flooding or of consequential injury, but a permanent condition, resulting from the erection of the lock and dam, by which the land is 'subject to frequent overflows of water from the river.' That overflowing lands by permanent backwater is a direct invasion, amounting to a taking, is settled by Pumpelly v. Green Bay & M. Canal Co., 13 Wall. 166, 177, 20 L.Ed. 557, 560; United States v. Lynah, 188 U.S. 445, 468–470, 23 S.Ct. 349, 47 L.Ed. 539, 547–549."

And, again, the court says (243 U.S. 316, at pages 326, 327, 37 S.Ct. 380, 384, 61 L.Ed. 746) : "We deem it clear that so much of the properties of the respective defendants in error as was unaffected by the flow of the rivers or their tributaries prior to the construction of the locks and dams in question was private property, and not subject to be overflowed, without compensation, in the raising of the level of the rivers by means of artificial dams."

▓▓ The allegation in plaintiffs' declaration in the case at bar is to the effect that the purpose in constructing the dyke complained of was to change the current of the river. There is no claim that the purpose was to dam up the river and throw permanent backwater upon plaintiffs' lands, as in the Cress Case. The declaration in the instant case alleges that, "The purpose of changing the current of said river was to force the channel of commerce at said point upon the Tennessee side to improve naviga-

tion." On such allegation, the consequential damage to riparian owners is damnum absque injuria. No case has been cited or found where damages have been awarded against the United States for diverting the current of a navigable river under its interstate commerce powers.

The contrary doctrine is believed to have been established in Bedford v. U. S., supra, and Jackson v. U. S., supra, upon the facts and reasoning in those cases.

In Sanguinetti v. United States (1924) 264 U.S. 146, 44 S.Ct. 264, 265, 68 L.Ed. 608, the most recent Supreme Court authority considered, it was held on the facts therein appearing that no "taking" of land, within the meaning of the Fifth Amendment, was shown, "and that therefore no recovery could be had upon the theory of an implied contract, but that the liability sought to be enforced was one sounding in tort, of which the court had no jurisdiction."

The Supreme Court evinced its approval of the doctrines of the cases which this court has followed in reaching the conclusion that the demurrers herein must be sustained. In the concluding paragraph of the opinion in the Sanguinetti Case, Mr. Justice Sutherland, delivering the unanimous opinion of the Supreme Court, said: "But this and all other matters aside, the injury was in its nature indirect and consequential, for which no implied obligation on the part of the government can arise. See Gibson v. United States, 166 U.S. 269, 17 S.Ct. 578, 41 L.Ed. 996; Bedford v. United States, 192 U.S. 217, 24 S.Ct. 238, 48 L.Ed. 414; Northern Transportation Co. v. Chicago, 99 U.S. 635, 25 L.Ed. 336; Jackson v. United States, 230 U.S. 1, 33 S. Ct. 1011, 57 L.Ed. 1363; Horstmann Co. v. United States, 257 U.S. 138, 42 S.Ct. 58, 66 L.Ed. 171; Coleman v. United States (C.C.) 181 F. 599."

Industrious counsel have cited and urged many other decisions in support of their opposing contentions; but, inasmuch as this court does not desire to lengthen this opinion beyond the necessary limit of clear elucidation of the reasons for its ruling, based upon its interpretation of the Supreme Court authorities cited, the discussion of authorities will end here.

No right of recovery is found independently of statute, and none appears from the language of the statute itself. The mere reading of section 702c of the Act of Congress under consideration is convincing that liability of the United States for the damage complained of, in the manner described by plaintiffs in their declarations, is not provided for by the terms of the act. On the contrary, the general clause of said section exempts liability in these words: "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place."

Then follows the provision excepting from nonliability damages resulting to lands "not now overflowed or damaged by reason of the construction of levees on the opposite banks of the river."

The language is plain, and levees are not dykes. Therefore, injury to riparian owners from the construction of dykes manifestly falls within the general provision of nonliability of the United States for damages from floods or flood waters at any place.

As heretofore stated, and for the reasons herein given, the second, third, and fourth grounds of the demurrers are sustained.