Hay, Judge,
reviewing- the facts found to be established, delivered the opinion of the court:
This is a suit brought by the plaintiff (the Natron Soda Co.) against the United States for the alleged taking of its property, a so-called soda lake situate in the State of Nevada. This lake, known as Big Soda Lake, had been in the possession of the plaintiff and its predecessors in interest for a number of years prior to the year 1906. From the waters of this lake the plaintiff manufactured and marketed a carbonate of soda, a valuable pi’oduct; and the plaintiff had constructed and maintained a plant for the recovery of this soda from the waters of this lake. This plant was in full operation in the year 1906.
Big Soda Lake is situated in an area known as the Carson Sink Valley, a depression in the earth’s surface covering many thousand acres of land, which was during a past geologic age the bottom of an inland sea, now called Lake Lahontan. The slope of this depression in the neighborhood of Big Soda Lake is in a general northeasterly direction with a grade of about 10 feet to the mile. The lowest depressions in the earth’s surface within this area are the Big and Little Soda Lakes and the Carson River. Prior to the year 1907 the surface of the Big Soda Lake was about 3,935 feet above sea level. The Carson River approaches within 2 miles of this lake, at which point its altitude is about 4,000 feet, and it flows in a general easterly direction until it reaches a point near the town of Fallon, at which it turns and runs in a general northerly direction.
The Big Soda Lake is the result of accumulations of water in a volcanic crater drawn from the general body of underground waters in the Carson Sink Valley. This crater forms an inverted conical depression in the floor of Lake Lahontan with a rim rising from 80 to 100 feet above the floor of the present valley and with deep converging inner walls.
The seasonal rainfall upon the valley floor averages about 4 inches, and is negligible as a source of ground water re *173 plenishment. The bottom of this lake was below the level of the water table, and the only known source of water supply was the small springs which seeped into the lake. These springs were supplied by seepage from the Carson River, the only known source of supply of underground water of this valley. These underground and percolating waters are hidden and invisible. It does not appear from the evidence how they are governed, or how they move underground.
From prior to 1867 to 1906 the level of Big Soda Lake had not raised more than 2 feet.
In 1906 the United States Reclamation Service, acting under authority of acts of Congress, constructed the Truckee-Carson project, consisting of dams, canals, and other structures, whereby large quantities of surface waters theretofore confined to the watershed of the Truckee River were in 1906, and during each year since then, transferred to the watershed of the Carson River. This water, together with surface waters, entering the Carson River from its own watershed, was by this irrigation project conserved, controlled, and distributed to various and sundry tracts of land in the Carson River Valley for irrigation purposes. Among the units comprising this irrigation system is a dam known as Lahontan Dam, and canals known as T line canal, U line canal, and N line canal, and Truckee canal, with their laterals. Each of said canals passes within two miles of Big Soda Lake, except the Truckee canal, and their altitude is about 100 feet higher than the lake, and about 40 feet higher than Carson River. This irrigation system transports large amounts of water through each of said units during the irrigation season of each year, which includes the months of April and September, and stores large quantities of water in the Lahontan Dam during every month of each year.
The plaintiff’s predecessors in interest conveyed to the United States a right of way through its lands for the construction of the Truclcee-Carson project in consideration “ of the benefits derived from the construction of irrigation works through or in the vicinity of the said lands.” The contract by which the plaintiff’s predecessors in interest agreed to convey said right of way to the United States *174 contained the following provision: “ It is further agreed that in consideration of the premises, the first party hereby releases the second party from all claims for damages for entry, survey, or construction of said works.” The deed made in pursuance of said contract did not contain the aforesaid provision. The evidence does not disclose what, if any, damage resulted to the plaintiff from the construction of any of said works on the land of the plaintiff.
With the advent of the Truckee-Carson project the body of ground water in the entire section covered by the project rose; the volume of water in Big Soda Lake has continually increased, and the level of said lake has risen about 19 vertical feet during the period from 1906 to 1916; the recovery of minerals from the waters of said lake ,is no longer possible; the machinery, vats, houses, and other improvements which constitute the manufacturing plant of the plaintiff have been permanently flooded; the land of the plaintiff immediately surrounding said lakh has been inundated ; and the value of the property of the plaintiff has been destroyed.
From the time the Truckee-Carson project was completed in 1906 to the year 1915 over 26,000 acres of additional land had been subjected to irrigation under the project, there having been 14,000 acres under irrigation before the project was completed.
No negligence on the part of the defendants is alleged or proven in the construction or operation of the canals or units of the project.
The value of the property of the plaintiff which has been destroyed is $45,000.
Under this state of facts is the United States liable for the destruction of the plaintiff’s property under the fifth amendment of the Constitution ?
It is well settled that the fifth amendment to the Constitution, which provides that private property shall not be taken for public use without just compensation, does not impose upon the United States any greater liability than would attach to an individual or ordinary corporation. So far as we have been able to ascertain, it has never been held that this amendment amplifies or enlarges the responsibility *175 of the Government beyond the legal liability of persons, either natural or artificial. Indeed, this doctrine has been asserted by the Supreme Court of the United States, not, it is true, with respect to cases involving irrigation projects, but in cases involving the rights of riparian owners who have sought to recover for damages to their property caused by the Government in its work in improving navigable streams. Bedford v. United States, 192 U. S., 217, 223; Jackson v. United States, 230 U. S., 1, 21, 22.
There is no dispute about the powers of the Government to construct the works which, it is claimed, caused the destruction of the plaintiff’s property. It is alleged by the plaintiff that the Government in the exercise of its power of eminent domain under the Constitution of the United States, and by authority of the acts of Congress, did construct, build, and maintain certain canals, etc. Nor is the legality of the acts of the Government in any way questioned by the plaintiff. Indeed, the plaintiff conveyed to the defendants a right of way through its land for the construction of the canals, of the result of which construction the plaintiff now complains. If, therefore, the United States can not be held any more liable than an individual or ordinary corporation for the acts complained of, it becomes important to inquire to what extent, if any, an individual, or ordinary corporation, could be held liable for the destruction of the plaintiff’s property under the state of facts disclosed by the record.
The plaintiff is the owner of a lake which for many years has been used by him and his predecessors to manufacture soda from its waters, and he has erected a plant, consisting of vats, houses, etc., to aid him in this manufacture. The irrigating system, where put into operation, causes an increase of underground water not only affecting the plaintiff, but the whole territory in which the land of the plaintiff is situated. The question then is, would the plaintiff have the right, as against an individual or ordinary corporation, to prevent him or it from irrigating the lands of this valley, if such irrigation has the effect of increasing the quantity of underground water to such an extent as to submerge the lake of the plaintiff and destroy the value of his property ? *176 If hardly seems possible to reconcile such a right with the rights of landowners or to fix any reasonable limits to the exercise of such a right. Such a right as that contended for would practically prevent the irrigation of all the lands in the Carson Sink Valley. Suppose a man irrigated his own land, and the amount of percolating water which found its way into the lake of the plaintiff had a sensible effect upon it, it would not be contended that an action would be maintainable. But if all the landowners of the Carson Sink Valley irrigated their lands, and thereby increased the amount of underground water to such an extent as to destroy the property of the plaintiff, could the plaintiff maintain an action against any one of them, or could it maintain an action against a corporation which did the same thing as the owners themselves could do? Such a right as that claimed by the plaintiff is too indefinite and unlimited. The principles applicable to surface waters do not pertain to underground waters, which have no certain course or defined limits. In the case of Kansas v. Colorado, 206 U. S., 46, 107, the court says:
“ Indeed, the extent to which seepage operates in adding to the flow' of a stream, or in distributing water through lands adjacent to those upon which water is poured, is something, proof of which must necessarily be almost impossible. The underground movement of water will always be a problem of uncertainty.”
Percolating water is a hidden, invisible thing. How it moves is more a matter of conjecture than knowledge — of inference rather than proof. It would seem impossible to apply any law, beyond the general principle of reasonable use of one’s land, to such a hidden and formless thing. Weil on Water Rights, vol. 2, p. 1098. It seems, therefore, that the existence, origin, movement,- and course of underground waters, and the causes which govern and direct their movements, are so secret, occult, and concealed that an attempt to administer any set of legal rules in respect to them would be involved in hopeless uncertainty, and would be practically impossible, because any such recognition of correlative rights would interfere to the material detriment of the commonwealth with drainage and agriculture, mining, *177 the construction of highways and railroads, with sanitary regulations, building, and general progress of improvement in works of embellishment and utility. Angell on Watercourses, 7th edition, 171.
It seems to us that while the property of the plaintiff may have been destroyed by the irrigation system of the Government, yet the influences which have brought about this destruction are so secret, changeable, and uncontrollable that we can not subject them to the regulations of law, nor build upon them a system of rules as has been done with streams upon the surface; so that if the plaintiff has incurred a loss from the movement of these underground waters in this valley it is damnum absque injuria.
It would appear that the claims of the plaintiff is that primitive conditions must be suffered to remain, and that no progress or development can be had if the property of the plaintiff should be injured thereby. Thus a claim is set up to a vested right to keep conditions in statu quo which existed at the time its property was acquired to the extent of preventing anyone from improving surrounding property unless damages are paid to the plaintiff. Such a doctrine would result in preventing the owners of surrounding property from putting their property to its legitimate use.
From the very nature of the case, and the character and movement of underground water, we conclude that the property of the plaintiff was not destroyed by a direct invasion but was the incidental consequence of the lawful .and proper use of a governmental power, and therefore there can be no recovery.