ACME LAND & FUR COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 50630, 62886. Promulgated November 14, 1934.

*John J. Finnorn, Esq.*, for the petitioner.
*DeWitt M. Evans, Esq.*, for the respondent.

OPINION.

STERNHAGEN: The respondent determined deficiencies in petitioner's income tax of $3,302.12, $112,846.66, and $19,476.49, for the fiscal years ended November 30, 1927, 1928, and 1929. Several matters have been settled, and two items are left in controversy. The respondent included in petitioner's income amounts received for damage to its property resulting from flood control, and disallowed part of the deduction taken for salaries.

1. Leaving aside the history antedating the formation of petitioner on January 19, 1927, the facts upon the first point are these. Petitioner, on February 19, 1927, bought 110,000 acres of marsh land in the parishes of St. Bernard and Plaquemines, Louisiana, for which it paid $800,000. The land was valuable only as trapping ground for muskrats and other wild fur-bearing animals. Petitioner was not engaged in trapping, but its business was the sale of the land in smaller parcels to trappers on time contracts and their notes, frequently taking the skins in payment. It immediately adopted the sale contracts of its predecessor for the sale of parcels of its land, and in 1927, before the flood in April, it had contracts covering the sale of, or had sold, 8,450.6 acres for $324,450. Thereafter (apparently within the same year, although the stipulation as to this is ambiguous), it sold 18,226 acres for $771,453.70. Later sales were at a lower figure.

The Mississippi flood of April 1927 threatened the city of New Orleans and, exercising the police power, the state cut a crevasse through the levee below the city and completely inundated petitioner's land for 108 days. Both wild animal life and the grass which normally sustained it were seriously harmed, although not entirely destroyed. The grass soon returned, and later began to die. The extent of destruction of muskrats caused petitioner to prohibit trapping for two seasons. It was resumed in the season of 1929–1930, when 900,000 muskrats were taken; 1,000,000 were taken in 1930–1931, 500,000 in 1931–1932, 300,000 in 1932–1933, and 175,000 in 1933–1934. It is now thought that the muskrats are migrating to other lands.

Although by statute in Louisiana wild life belongs to the state until capture, Dart's Louisiana Statutes (1932), sec. 2926; Rev. Civ. Code, art. 3415; LaCoste v. Department of Conservation, 263 U. S. 545, the necessary legislation was adopted and an appropriation was made of $1,500,000 for distribution among the owners of the inundated lands in recognition of damage sustained by them resulting from the " effects of the Caernarvon artificial crevasse upon wild animal life." Of this, $1,300,000 was immediately made available, and in the fiscal year ended November 30, 1928, petitioner re-

ceived $938,575.90. In the fiscal year 1929 it received $158,220.63 out of the remaining $200,000. Petitioner also received $30,000 in settlement of its claim for $323,611.10 as damage to its land and buildings, but this, it is stipulated, is not now in controversy.

The petitioner did not include any part of the $938,575.90 or the $158,220.63 in its income tax return. The respondent determined that the 1928 income included both the $938,575.90 and the $200,000, and for 1929 he also added the $158,220.63. It is conceded now that the $200,000 should not have been included for 1928.

Petitioner justifies its omission on two grounds. First, since there was no obligation of the state to pay for the destruction of wild life in the exercise of the police power, *Commonwealth* v. *Plymouth*, 232 U. S. 531; *Jackson* v. *United States*, 230 U. S. 1; *C. B. & Q. Railway* v. *People*, 200 U. S. 561; *Hulen* v. *City of Corsicana*, 65 Fed. (2d) 969; *Ruch* v. *New Orleans*, 43 La. Ann. 275, 284, the amount was not income but a nontaxable gift, and, second, it was constitutionally immune from Federal tax because it was received from the state, citing *Indian Motocycle Co.* v. *United States*, 283 U. S. 570. In our opinion, both contentions must fail. Clearly the amount was not a gift and did not purport to be. It was only paid in recognition of the damage which had resulted from the state's act under the police power. If legal consideration were necessary to give validity to the payment, this would suffice. But the absence of a legal obligation or legal consideration does not establish a gift. The gift provision of the statute (Revenue Act 1928, sec. 22 (b) (3)) is not a catchall for exemption. A gift must be affirmatively established by evidence. Intention to make a gift must appear, *Fisher* v. *Commissioner*, 59 Fed. (2d) 192; *Mulqueen* v. *Commissioner*, 65 Fed. (2d) 365, and this proof must be strong enough to outweigh the duty against waste or plunder, *Noel* v. *Parrott*, 15 Fed. (2d) 669; *Fisher* v. *Commissioner*, *supra*, and stronger than countervailing evidence of past service, moral suasion or any other nondonative motive. Congress or a state legislature may often appropriate after the event, in recognition of a past circumstance, but no one would regard the amount as a gift. This is such a case, the impulse being one of justice and duty rather than generosity, however it may have turned out in effect.

The petitioner suggests, rather than argues, that because the amount came to it from a subdivision of the state it is constitutionally immune from Federal tax. Immunity does not attach to all receipts from a state or municipality. The gains in condemnation awards, for example, are recognized as *per se* taxable, *Bandes* v. *Commissioner*, 69 Fed. (2d) 812, although they are expressly relieved when

immediately reinvested as the statute provides; and if the award includes severance damages, the excess over proportionate cost of the damaged property is taxed, I.T. 2599, X–2 C.B. 170. Pay received for services performed for a state may be taxable, *Metcalf & Eddy* v. *Mitchell*, 269 U.S. 514, although when received by an officer or employee of the state it may be immune if Federal taxation operates to interfere with the sovereign functions of the state. There is here no evidence that the Federal tax imposed upon petitioner by reason of its receipt of the amount in question in any way affects the state and we are referred to no authority requiring recognition of it *a priori* or by judicial notice. When the crevasse was cut there was no liability of the state for damage, and there is no reason to believe that the amount of the award subsequently made was influenced by the possibility that as to each claimant it would become part of the gross income involved in the computation of his Federal tax. We can not say that the tax was either directly or indirectly upon the "instrumentalities, means and operations whereby the states exert the government powers belonging to them." *Indian Motocycle Co.* v. *United States, supra.* That case, furthermore, involved not an income tax but an excise tax on sales and was predicated upon an economic incidence of such a tax upon the state as buyer, a consideration which can not easily be identified with an award for damage made voluntarily after the event.

Of the 110,000 acres originally owned by petitioner, it had disposed of 26,676 acres, about one fourth, for more than the cost of the whole, and it still owned the remaining 83,324 acres, the proportionate cost of which was approximately $605,765. Judging from the amount received for the acreage already sold, the value of the remaining land was, at the time of the crevasse, far in excess of the petitioner's investment. There is nothing in the record to indicate that after the subsidence of the water the petitioner's remaining land represented less than the $605,765 that petitioner had invested in it. The evidence shows that there were some sales (the extent of which is not disclosed) after the crevasse at prices which were less than the sale prices antedating the crevasse. This does not go so far as to say that such later prices were less than cost. The state biologist was optimistic and every one interested seemed to believe sufficiently in the trapping prospects to agree upon a temporary cessation of activities. Judging by the value of the land at the time of cutting the crevasse, it was not unlikely that the reparation award was in recognition not of complete destruction, but of only partial damage to the value of the taxpayer's property. Apparently it still had lands worth more than their proportionate cost, although they may have

been worth less than their pre-crevasse sale value. Even this reduction in value was not by reason of a taking by the state of anything which the petitioner held as owner, but only a recognition that petitioner's hoped for future profits would be impaired by the state's destruction of wild life. The net result to this petitioner, so far as the evidence shows, was to leave it with no impairment of its original investment, since it still held all of its land with the probability of sale at a profit and in addition thereto it had the cash award of $938,375.90 in the fiscal year 1928 and $158,220.63 in 1929. This, we think, must be treated as clear gain in those years and included within the taxpayer's income. The Commissioner's determination is sustained.

2. The petitioner's two officers owned 80 percent of its shares in equal proportion. The corporation, for its fiscal year 1927, deducted $65,000 as salaries paid to these officers of $32,500 each, and deducted $75,000 for 1928 and $75,000 for 1929, representing $37,500 to each. The Commissioner determined that a reasonable deduction was $20,000 per year, or $10,000 for each officer, and disallowed the deduction of the rest. This throws the burden squarely on the corporation to prove affirmatively that the amount claimed, or any amount above the Commissioner's, represents no more than a reasonable allowance, *Botany Worsted Mills* v. *United States*, 278 U. S. 282. The fact, as is shown, that the amounts paid for 1927 and 1928 were authorized by corporate resolution does not demonstrate their reasonableness as compensation for the services performed, and when the recipient officers are at the same time the principal shareholders there is for that reason a question whether the amounts may not be corporate distributions, *McMillan Metal Co.*, 2 B. T. A. 797; *Brown & Haley*, 21 B. T. A. 752; *Fifteenth & Chestnut Realty Co.*, 29 B. T. A. 1030.

The evidence shows that the president performed substantial service, including the procuring of the damage award, and that the vice president, who was thoroughly familiar with the property, the trappers, and the problems inherent in petitioner's business, also gave substantial time and attention to its rehabilitation after the flood. But the Commissioner, apparently knowing these facts, has held that $10,000 each was a reasonable annual allowance for these services. We can not say the evidence proves the allowance to be inadequate or otherwise not reasonable. The Commissioner's determination is therefore sustained.

3. The issues which have been settled by stipulation will be taken into consideration in the necessary recomputation of the deficiencies.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*