Rohl-Connolly Company v. Commissioner.
Rohl-Connolly Co. v. Commissioner
Docket No. 500.
United States Tax Court
1946 Tax Ct. Memo LEXIS 191; 5 T.C.M. (CCH) 379; T.C.M. (RIA) 46115; May 21, 1946
*191 Upon the facts the reasonableness of salaries of petitioner's two principal officers determined; the transfer arranged by petitioner's two controlling stockholders to a corporation owned by one of them of a long-term engineering contract then being performed by petitioner and sale of certain machinery and equipment in connection therewith was an arm's length transaction, and where petitioner, on a percentage of completion basis, reported a profit on the contract in 1938 and transferred the contract, machinery and equipment in 1939 under an agreement whereby the transferee was to have any profit and assume any loss on the whole contract, petitioner properly deducted on its 1939 return a loss sustained upon the transfer of the equipment measured by the difference between the book values of the assets transferred and the consideration paid; and petitioner did not derive income in the amount of depreciation taken in its 1938 return on assets transferred in 1939 at depreciated values nor in the amount allowed for fully depreciated assets included in the transfer. John M. Martin, Esq., and Frank L. Martin, Jr., Esq., 714 West Olympic Blvd., Los Angeles, Calif., for the petitioner. E. C. *192 Crouter, Esq., for the respondent. ARNOLD Memorandum Findings of Fact and Opinion ARNOLD, Judge: The petitioner challenges deficiencies determined by the respondent in income tax for the calendar year 1938 in the amount of $28,845.23; for the period January 1, 1939, to September 30, 1939, in the amount of $12,160.10; and for the fiscal year ended September 30, 1940, in the amounts of $29,938.81 in income tax and $2,219.12 in declared value excess profits tax. In his second amended answer respondent asks that the deficiency for the taxable period ended September 30, 1939, be redetermined in the amount determined in the deficiency notice, $12,160.10 plus an increase in the amount of $25,735.35, making a total deficiency of $37,895.45 for such period. The issues raised in the petition are whether respondent erred in disallowing in part deductions taken on the returns for officers' salaries for each period and whether respondent erred in disallowing a deduction from net income for the fiscal year ended September 30, 1940, for traveling expenses in the amount of $7,900. No evidence was introduced with respect to the item of traveling expenses and that issue was abandoned by petitioner. *193 The increased deficiency asserted by respondent is based upon respondent's determination that a deduction for a loss alleged to have resulted upon the transfer of a contract undertaken by petitioner was not allowable and that certain gain was derived by petitioner in connection with the transfer which constituted unreported income. Findings of Fact Petitioner is a corporation having its business headquarters in Los Angeles, California. Its returns of income and excess profits taxes for the calendar year 1938, the taxable period January 1, 1939 to September 30, 1939, and the fiscal year ended September 30, 1940, were filed with the collector of internal revenue at Los Angeles, California. Petitioner's stock was owned 25 percent by H. W. Rohl, 25 percent by Floy E. Rohl, his wife, and until September 15, 1938, 50 percent by T. E. Connolly. On September 15, 1938, Connolly transferred his stock to T. E. Connolly, Inc., a corporation owned entirely by Connolly. Petitioner started in business in the fall of 1933. H. W. Rohl and T. C. Connolly have at all times been the president and vice-president and sole manager and operators of the corporation. During the taxable periods Rohl devoted *194 all his time to the business of the petitioner and Connolly devoted most of his time to the business of petitioner, with the exception of part of 1939 and part of 1940. For the calendar year 1938 the petitioner filed an income and excess profits tax return reporting total cross profit from its business in the amount of $576,344.37, total deductions of $378,949.22, and net income of $197,395.15 upon which income tax of $37,505.08 was reported. The petitioner filed an income and excess profits tax return for the period January 1, to September 30, 1939, reporting total income of $440,209.04; total deductions of $300,033.25 and net income of $140,175.79, upon which an income tax of $25,383.41 was reported. The return states that permission was granted to change from a calendar year basis to a fiscal year ending September 30. The petitioner filed an income and excess profits tax return for the fiscal year ended September 30, 1940, reporting total combined net income from its operations in the amount of $328,431.03, and total income tax of $61,151.90. The petitioner kept its books and accounting records, and filed its returns, on the accrual basis. It reported profits from long-term contracts *195 on a percentage of completion basis. Petitioner is engaged in the heavy engineering construction business involving water hazards such as the construction of dams or breakwaters and other river and harbor work. The work involves large scale excavations, quarry operations, concrete works, placing rock in the ocean, and diversion of rivers. It requires the use of heavy machinery, power shovels, barges and tugs. The bidding and supervision of the work undertaken by petitioner requires experience with mechanics, excavating, quarrying, explosives, concrete installations, marine equipment, flood conditions, sea conditions, and the ability to plan operations to overcome obstacles in performing construction work in an economical manner. Rohl and Connolly are construction men with many years' experience in supervising difficult construction projects. About 1925 each went into the construction business for himself. In 1932 they associated themselves as partners to construct a hydraulic fill dam. Subsequent to this association they formed the petitioner corporation. During the 5-year period 1929 to 1933, inclusive, Rohl's net income averaged about $144,000 per year and Connolly's income averaged *196 about $107,000 per year. Their net incomes for 1934 to 1937, inclusive, are not shown. During the years 1938, 1939 and 1940 petitioner obtained a $2,000,000 dam contract on the Provo River in Utah, a $4,000,000 dam contract on the Colorado River in Arizona, $1,300,000 in breakwater and rock supply contracts in Los Angeles harbor and vicinity, $1,000,000 in river and harbor work, and in interest with other companies in the construction of a $7,000,000 dam in Colorado. It had gross receipts of about $5,850,000 during the taxable periods here involved. All petitioner's work was obtained through competitive bidding and Rohl or Connolly or both personally made all the bids for petitioner. Rohl and Connolly personally obtained the petitioner's contracts, arranged for their financing, made the necessary purchases, acquired the equipment and plant, planned and laid out the work, hired the personnel and directed the performance of the work. One or the other of these officers would take charge of a contract and give all the orders, staying on the job as much as might be necessary. The other of these officers would have charge of another job but each would visit the other jobs and collaborate *197 in solving the problems arising. These officers were in constant communication with each other and if both were away from a particular job they always remained in communication with the work. In obtaining surety bonds guaranteeing the performance of the petitioner's contracts Rohl and Connolly individually pledged their personal financial resources to the surety companies. Their joint financial resources enabled the petitioner to procure large contracts which otherwise would not be available to it. On its earlier contracts petitioner invested all its capital in equipment and a percentage of each contract price was withheld until after completion of the contract. There were no monies available for officers' salaries or dividends until the end of 1936. At that time petitioner paid $132,000 to Rohl and Connolly in salaries for 1936 and prior years, allocated $12,000 to 1933, $24,000 to 1934, $48,000 to 1935 and $48,000 to 1936, and paid $60,000 in dividends. In 1937 petitioner paid $87,500 to Rohl and Connolly in salaries and $40,000 in dividends. For the calendar year 1938 petitioner paid Rohl and Connolly $100,000 each as salaries. For the nine months' period ended September 30, 1939, *198 petitioner paid Rohl a salary of $75,000 and Connolly a salary of $25,000. For the fiscal year ended September 30, 1940, petitioner paid Rohl and Connolly each a salary of $100,000 and paid $50,000 in dividends. A reasonable allowance for salaries for services actually performed was $120,000 for 1938, $55,000 for the period ended September 30, 1939, and $120,000 for the fiscal year ended September 30, 1940, and such amounts were a part of the ordinary and necessary expense of petitioner for such periods. Petitioner's gross revenues, expenses, officers' salaries, dividends, and net additions to surplus were as follows: Expenses
Gross
Including
Officers'
Dividends
Net Income
Years
Revenues
Salaries
Salaries
Paid
to Surplus
1933
$ 72,923.18
$ 80,928.70
($ 8,005.52)
1934
1,121,009.15
1,086,094.91
30,383.16
1935
1,069,529.40
1,040,352.27
24,923.79
1936
1,221,382.12
1,204,636.45
$132,000.00 a *199 $60,000.00
15,055.26
1937
1,791,059.45
1,456,347.28
87,500.00
40,000.00
250,497.49
1938
1,708,820.31
1,485,677.45
200,000.00
179,803.62
9 months
ending
Sept. 30, 1939
1,534,317.96
1,361,752.88
100,000.00
50,000.00 b
140,627.97
Fiscal year
ending
Sept. 30, 1940
2,731,197.30 c
2,419,280.69
200,000.00
50,000.00
250,764.71
In February 1938, petitioner was awarded the contract for the construction of the Deer Creek Dam on the Provo River, Utah, by the Bureau of Reclamation upon its bid of $2,189,096. This bid was submitted by Connolly on behalf of petitioner without collaboration with Rohl. Petitioner commenced with the work in the spring of 1938. Connolly transferred certain supplies and materials and equipment owned by T. E. Connolly, Inc., from another job undertaken by the latter corporation to the Deer Creek Dam for use upon the construction work undertaken by petitioner. In petitioner's return for 1938 the operation of this contract was reported as resulting in gross receipts of $503,390.72, costs of $460,858.03, net direct costs of $372,665.81, (after deducing deferred amounts) and gross income of $130,724.91. Petitioner's computations showed that on this contract depreciation amounted to $43,973.05, a job profit of $86,751.86 resulted, camp earnings amounted to $7,719.50 and total profit on the job amounted to $94,471.36. When Rohl learned of the contract he considered the bid too *200 low and when it later development that the construction of the work was delayed by reason of the failure of the Government to secure necessary right-of-way for the relocation of a railroad and highway Rohl concluded that the contract would be a losing venture to petitioner. Connolly then made an offer to Rohl that Connolly and T. E. Connolly, Inc., would take over the performance of the contract. A written agreement was entered into between petitioner as first party and Connolly and T. E. Connolly, Inc., as second parteis whereby Connolly was authorized to act as petitioner's agent in the performance of the contract; second parties agreed to pay all expenses for performing the contract from its inception to completion, and to reimburse petitioner for all sums expended on the contract; petitioner agreed to turn over to the second parties all amounts thereafter received from the Government under the contract and second parties agreed to use the funds in payment of construction costs and to reimburse petitioner for all costs and expenses incurred by it in performance of the contract up to April 1, 1939, and for all monies petitioner might be required to expend in the future on account *201 of the contract. All plant, machinery and equipment or materials and supplies on the job were to become the property of second parties. A computation of receipts and costs on account of the contract up to April 1, 1939, was made and after certain adjustments were made it read as follows: DEER CREEK DAM
STATUS OF CONTRACT
APRIL 1, 1939
Net received on estimates, including March 1939 progress payment
$473,475.86
Miscellaneous earnings - camp earning, etc.
8,061.36
$481,537.22
Costs (per Rohl-Connolly Co. books) -
Job costs to December 1938
$460,858.03
Job costs to March 31, 1939
31,583.48
Payroll taxes - March 1939
166.42
Warehouse expense - March 1939
65.97
$492,673.90
Less - Credit on warehouse expense to December 31, 1938, included in
job costs
10,715.83
481,938.07
Excess of job costs over receipts
420.85
Proportion of administrative and general expense (based on gross receipts
of jobs) -
To December 31, 1938 - 32.16% of
$ 42,452.04
13,652.58
To March 31, 1939 - 5.49% of
7,203.39
395.47
Excess of costs due Rohl-Connolly Co.
14,468.90
Prepaid bond premium
25,444.09
Insurance deposits, cash, etc.
7,199.14
Credit previously allowed to T. E. Connolly, Inc. on shovel purchase
6,569.00
Equipment (per list)
134,493.18
Total exclusive of equipment not on records and
188,174.31
Miscellaneous equipment, fully depreciated and not carried on books
20,000.00
Total exclusive of equipment rental
$208,174.31
*202 After negotiations Connolly, representing second parties, and Rohl, representing petitioner, agreed in writing that second parties would pay and petitioner would accept the sum of $208,174.31 as reimbursement for the amounts expended by petitioner from the commencement of the contract to April 1, 1939, and in payment for the transfer to second parties of certain assets and equipment applied to the job by petitioner and the retained percentage held by the Government which had been earned through the partial performance of the contract, all of which items had a book value of $270,837.85. In addition Connolly refrained from presenting a claim against petitioner for supplies and materials furnished by T. E. Connolly, Inc., in the amount of $44,839.89, and for rental of certain machinery and equipment of T. E. Connolly, Inc., used on the job during 1938, the value of the rental of which had not been agreed upon. The assets transferred and a computation of the consideration are shown in an exhibit introduced in evidence as follows: ROHL-CONNOLLY CO.
TRANSFER OF DEER CREEK DAM CONTRACT
TO T. E. CONNOLLY, INC., AND T. E. CONNOLLY AS OF APRIL 1, 1939
Assets delivered to T. E. Connolly, Inc., as of April 1, 1939 -
Amounts due on contract represented by retainage withheld from progress payments
$ 52,608.43
Cash deposits in local banks, insurance deposits, etc.
7,373.98
Unused bond premium
25,444.09
Camp construction costs
$ 88,192.22
Less depreciation accrued
19,598.27
68,593.95
Equipment at cost
141,192.18
Less depreciation accrued
24,374.78
116,817.40
Total book value of assets
270,837.85
Credit allowed T. E. Connolly, Inc. in consideration for indemnifyingrohl-
Connolly Co. represented by the amount of the net gain from Rohl-
Connolly Co.'s operations on this contract to April 1, 1939, as follows..
Results from operations on contract: Gross profit earned to December 31, 1938
130,724.91
Less depreciation on equipment
43,973.05
Net
86,751.86
Camp earnings
7,719.50
Total earnings in 1938
94,471.36
Loss sustained January 1, 1939 to March 31, 1939 (April 1, 1939)
(8,408.93)
86,062.43
Sub-total
184,775.42
Additional charges: Old equipment previously fully depreciated in use on the contract, at
value agreed upon by Messrs. Rohl and Connolly
20,000.00
Miscellaneous adjustments of overhead and costs as agreed upon by
Messrs. Rohl and Connolly
3,564.61
Less: Adjustments arising subsequent to date of agreement
165.72
3,398.89
Net balance paid as follows: Surrender of note by T. E. Connolly payable by Rohl-Connolly Co.
$100,000.00
Note issued by T. E. Connolly, Inc. to Rohl-Connolly Co.
108,174.31
$208,174.31
*203 As a result of this agreement and transfer, petitioner sustained a loss of $62,663.54. In its return for the period ended September 30, 1939, petitioner showed with respect to the Deer Creek job, gross receipts of $22,693.55, and expenses of $31,583.48, resulting in a loss of $8,889.93; camp earnings of $481.00, and operations loss of $8,408.93, and also reported a loss of $62,797.71 on the transfer of the contract. Petitioner sustained a net operating loss of $8,408.93 in the performance of the Deer Creek Run contract from January 1, 1939 to April 1, 1939, a net loss of $62,663.54 in connection with the transfer of the contract on April 1, and a loss of $134.17 after April 1, 1939, or a total loss of $71,206.64. Such loss was sustained during the taxable period January 1, 1939, to September 30, 1939. Opinion The issue raised in the petition remaining for determination is whether the respondent erred in disallowing part of the deductions taken by petitioner in its returns for the taxable periods involved for salaries of its principal officers, Rohl and Connolly. Petitioner took deductions of $200,000 for 1938, $100,000 for the period January 1, 1939, to September 30, 1939, and $200,000 *204 for the fiscal year ended September 30, 1940. Respondent allowed $48,000, $36,000, and $48,000 of these amounts, respectively, and disallowed the remainder. The burden is on the petitioner to show whether any amounts of salaries in excess of those allowed by respondent for services actually rendered by these officers were a part of the ordinary and necessary expenses of petitioner for these periods, deductible under section 23 (a) (1) of the Revenue Act of 1938 and section 23 (a) (1) of the Internal Revenue Code. Botany Worsted Mills v. United States, 278 U.S. 282; Acme Land & Fur Co., Inc., 31 B.T.A. 582. Petitioner contends that the salaries paid its officers for the taxable periods were reasonable. Petitioner says the evidence shows that (1) Rohl and Connolly had each earned over $100,000 a year in net income from their personal businesses for several years prior to forming the petitioner corporation, (2) the earnings of petitioner were due primarily to their ability and resourcefulness, (3) in the taxable periods petitioner entered the field of building dams and earned substantially larger profits than before and (4) the officers performed the services of making bids and estimates, *205 planned and supervised the construction work, made all purchases necessary for the work, and pledged their personal resources to indemnify the insurance companies furnishing construction bonds. Petitioner argues as follows: In 1938 petitioner substantially increased its operations by undertaking the construction of Deer Creek Dam in Utah and Headgate Dam on the Colorado River while continuing with contracts for the construction of breakwaters near Los Angeles. At the end of 1938 petitioner had some $7,000,000 worth of work under contract. The supervision of the dams required that Rohl and Connolly spend a large part of their time upon the jobs and away from home. Since Rohl and Connolly had each earned over $100,000 a year prior to the formation of petitioner, these officers considered that the services of each to the petitioner were worth $100,000 for the year 1938, and since petitioner's earnings in 1938 prior to payment of salaries exceeded $400,000, they took $100,000 each as salary for that year. The petitioner then was in a more liquid position than before and was able to pay these salaries. These officers saved the petitioner considerable sums by making out bids themselves instead *206 of employing estimating services at a cost of $5,000 to $10,000 for each bid submitted. These officers supervised the jobs personally instead of employing general superintendents at substantial salaries and a percentage of the profits, as was done by other companies whose superintendents might earn $70,000 to $100,000 per year for such services. After deduction of salaries petitioner retained an earned surplus for 1938 of over $180,000 so that a dividend of 89 percent on the capital of $200,000 could have been paid from earnings. In 1939 Rohl continued to work on a full time basis for petitioner while Connolly devoted his attention primarily to the Deer Creek Dam, serving the petitioner during the first three months of the year and T. E. Connolly, Inc., during the next six months. For this reason he took a reduced salary of $25,000 for the taxable period of nine months in 1939 while Rohl received $75,000 therefor. After deduction of salaries for 1939 a net profit of $172,000 resulted or a return of 39 percent on the invested capital and surplus. In the fiscal year ended September 30, 1940, Rohl had devoted all his time to petitioner's work, supervising the construction of Headgate *207 Dam, and Connolly devoted part of his time to new projects of petitioner involving breakwaters and river work and a share in a $7,000,000 dam in Colorado. They considered their services worth salaries of $100,000 each for such period and after deduction of such salaries and a dividend of $50,000 petitioner had a net profit for the fiscal year of $311,000 or 41 percent of its invested capital and surplus as of the beginning of the period. According to Connolly's testimony, work on the Deer Creek Dam was commenced in March or April 1938. Rohl and Connolly were at first both on that job. In August of 1938 work on the Headgate Dam in Arizona was commenced and Rohl supervised that job from then until its completion in 1941. Connolly remained in charge of the Deer Creek Dam and was away from home on business for more than three-fourths of the time during 1938. In 1939, according to petitioner's return, operations at Deer Creek Dam were practically shut down during the first three months of the year and the weather prevented any material advancement of the work. According to Connolly, Rohl spent most of his time in 1939 at Headgate Dam, and while Connolly did some work there he spent most *208 of his time at Deer Creek Dam after April 1, 1939, following the transfer of the contract from petitioner to Connolly and T. E. Connolly, Inc. In the fiscal year ended September 30, 1940, Rohl was still in charge of the work at Headgate Dam, while Connolly continued with the job at Deer Creek, and beginning in August was engaged on work for petitioner on the John Martin Dam in Colorado, which petitioner undertook in collaboration with other contractors. During the taxable periods Connolly also had a 50 percent interest in Hanrahan-Connolly, Inc., which was constructing a million dollar dam near Eureka, California, and which paid him salaries of $12,000 for 1938, $12,000 for 1939, and $6,000 for 1940. In the period of its operations prior to 1938, a period of about four years and three months, petitioner added $203,000 to surplus, paid $100,000 in dividends and paid officers' salaries of $219,500. The total net earnings after taxes but before such salaries were about $523,000. The officers' salaries amounted to about 42 percent of this amount and averaged $51,600 per year. In the taxable periods of two years and nine months petitioner added $540,000 to surplus, paid dividends of $50,000 *209 and paid its officers $500,000. These earnings amount to $1,090,000. The officers' salaries were about 46 percent of this total, and averaged about $181,800 per year. The respondent contends that the amounts allowed by him as deductions for salaries represent reasonable allowances for compensation for services actually rendered by Rohl and Connolly and that the amounts disallowed in substance constitute dividends and profits. Rohl and Connolly through their stock interests, controlled petitioner and could take such of its profits as they chose as salaries, or as dividends, or could leave undistributed profits in the business. In the taxable periods they took $500,000 as salaries and paid $50,000 as dividends. $540,000 was added to surplus, more than doubling the invested capital and surplus as of the beginning of 1938. The directors of a corporation are not the sole judges of the reasonableness of salaraies of its officers. Gustafson Mfg. Co., 1 B.T.A. 508, where the payments are to shareholders the proof must show they are not disguised distributions of profits. L. Schepp Co., 25 B.T.A. 419. An examination of the returns indicates that all labor costs, other than salaries of these *210 officers, were for 1938, about $500,000; for the nine months' period in 1939, about $500,000; and for the fiscal year ended in 1940, about $850,000. The amounts taken as salaries of these officers are disproportionate to the total amounts paid for salaries or wages of all other employees of the petitioner, and to the dividends paid to stockholders. The reasonableness of salaries is a question of fact to be determined from all the evidence. While we agree with respondent that salaries taken by Rohl and Connolly were were in excess of a reasonable allowance for personal services actually rendered by them to petitioner during the taxable periods involved, we believe that the services were reasonably worth more than the amounts allowed by respondent in view of the increased earnings of petitioner for the taxable periods and the increased volume of work undertaken by the petitioner, and supervised by these officers. The increased profits were due very largely to the ability and resourcefulness of these officers. Furthermore, it has been shown that they performed the services ordinarily performed by general superintendents of construction engaged by other construction companies for substantial *211 salaries and bonuses. Petitioner paid Rohl and Connolly salaries for 1937 of $87,500. In the nine months' period ended September 30, 1939, Connolly performed comparatively little service for petitioner since the Deer Creek Dam operation which he superintended was practically shut down for the first three months of the period and he was operating it for T. E. Connolly, Inc. thereafter. In addition he was receiving a salary from Hanrahan-Connolly, Inc. of $12,000 a year for 1938 and for 1939, During the fiscal year ended September 30, 1940, Connolly was still engaged primarily with a job at Deer Creek for T. E. Connolly, Inc. and performed comparatively little service for petitioner. His work on the John Martin Dam in Colorado began in August, near the end of the fiscal year. Upon consideration of all the factors we have found as facts that a reasonable allowance for salaries for services actually performed was, for 1938 - $120,000, for the period ended September 30, 1939 - $55,000, and for the fiscal year ended September 30, 1940 - $120,000, and that such amounts are a part of the ordinary and necessary expenses of petitioner for such periods. In his second amended answer respondent *212 requests an increase in the deficiency for the taxable period ended September 30, 1939. Respondent, contends, first, that the deduction of $71,206.64 for a loss on the transfer of the Deer Creek Dam contract should not be allowed, and, second, that the transfer in fact resulted in a profit which constituted unreported income of petitioner. With respect to the first point respondent alleges that the assignment of the contract and transfer of assets to T. E. Connolly, Inc., was not a sale or exchange for a full and adequate consideration in money or money's worth and did not result in a deductible loss or diminution of petitioner's taxable income for such period and that the transfer between petitioner and T. E. Connolly, Inc., and T. E. Connolly, individually, was not an arm's length transaction between such parties. The good faith of the transaction is attacked on the ground that in view of the stock ownership of petitioner, it could not be said to have dealt at arm's length with Connolly. Connolly testified that he made the bid on the Deer Creek Dam contract without consulting Rohl who was in Honolulu at the time; that after the contract was awarded Rohl was of the opinion that the *213 bid was too low; that when most of the first season was lost because of the failure of the Government to secure right-of-way for relocating a railroad and highway petitioner was facing a loss on the contract; and that since Rohl disagreed with him over the matter, Connolly made Rohl a proposition that Connolly and his wholly owned corporation, T. E. Connolly, Inc., would take over the job and save Rohl and the petitioner whole. In order to carry out this proposal Rohl and Connolly had an audit made to determine the direct monetary costs met by petitioner on the contract and used this as a basis for determining the amount to be paid by Connolly and T. E. Connolly, Inc., to petitioner in effecting the transfer. After various adjustments in the computation a figure of $208,174.31 was agreed upon as the amount to be paid petitioner for the transfer of the assets of petitioner allocated to the job and the retained percentage held by the Government under the terms of the construction contract. The items covered by the transfer were the equipment, such as trucks and power shovels, and the camp constructed at the job-site, prepaid bond premium, various cash deposits and insurance deposits, *214 the retained funds held by the Government and certain fully depreciated assets. The camp and equipment were included at their depreciated values (after deduction of depreciation for 1938). Connolly agreed to include the fully depreciated assets at $20,000 in order to save the time and trouble of making an inventory of them. In our opinion the testimony shows sufficiently that the transfer of the contract was arranged between Rohl, acting for petitioner, and Connolly, acting on his own account and on account of T. E. Connolly, Inc., and was an arm's length transaction. Rohl and Connolly were in disagreement and the intent of the transaction was to adjust the accounts between the corporations in effecting a transfer of the contract in order that petitioner would sustain no loss, and that Connolly and his wholly owned corporation would take whatever loss or profit might result from the contract. Connolly said that a profit of $9,500 finally resulted. The petitioner had reported a profit on the percentage of completion basis on the part of the contract performed in 1938 and the effect of the transfer, with any resulting profit on the whole contract, to Connolly and his company could be *215 expected to produce a loss for petitioner in 1939 offsetting the 1938 profit reported by it. The agreement between petitioner and T. E. Connolly, Inc., was not actually a transfer of the contract. The petitioner remained primarily liable to the United States and the other corporation was not substituted for it nor joined with it in the contract with the United States. In effect the job was subcontracted from April 1, 1939, with the subcontractor agreeing to indemnify petitioner against an overall loss on its undertaking, and petitioner agreed that any profit resulting was to accrue to T. E. Connolly, Inc. The regulations [1] authorize the return of income from long-term contracts on the percentage of completion basis. Where a taxpayer returns income on such basis, it often occurs that a profit may be shown for one year and a loss for the following year, or vice-versa, the effect being that over the period of years covered by the contract the profits or losses reported will coincide with the net profit or loss resulting to the taxpayer from the whole contract. Hegeman-Harris Co. Inc. v. United States, 23 Fed. Supp. 450; W. F. Trimble & Sons Co., 1 T.C. 482. Had the petitioner completed *216 the contract and realized a net profit of only $9,500, as Connolly said resulted to T. E. Connolly, Inc., it would report losses in one or more subsequent years offsetting the profit reported on the 1938 return, except for $9,500 thereof. Since the petitioner, according to the arrangements for the transfer, was to take no profit or loss, as between the two corporations, it is a normal consequence that its books should show a loss in 1939. The loss taken is not identical in amount with the profit reported for 1938, since the transaction also involved the transfer of certain properties and funds. The journal entries of the transaction on the books of petitioner and T. E. Connolly, Inc., show a loss to petitioner and a corresponding profit to the other corporation. We think the transfer was made in good faith and that a genuine loss could result and did result to petitioner from the transaction. While under the agreement Connolly and T. E. Connolly, Inc., agreed to indemnify petitioner against any loss, that refers to a loss on the contract as a whole, and would not apply to a book loss for 1939 already compensated for by the book profit accrued and *217 reported for 1938. Respondent further contends in his second amended answer that gain and profit in the amount of $63,414.71 was derived by petitioner in connection with the transfer of the Deer Creek Dam contract and that such gain was derived (1) from depreciation in the amount of $43,973.05 on fixed assets already allowed and not included in the basis of assets transferred at the book value of $270,837.85, and (2) from fully depreciated assets transferred for a consideration of $20,000 (less certain minor amounts representing differences in estimates over actual cash or value of assets transferred.) Respondent has determined that this constituted unreported income of petitioner for the taxable period ended September 30, 1939. The item of $43,973.05 was for depreciation on equipment and on camp construction. It was accrued in 1938 and deducted in computing the profit on the contract reported on petitioner's 1938 return. The assets on which this depreciation was taken were transferred at their depreciated values and the transfer was shown on the books of both petitioner and T. E. Connolly, Inc., at such depreciated values. No depreciation was accrued by petitioner for 1939 prior *218 to the transfer. Since the depreciation was taken in 1938, this amount does not in any way represent gain or profit to petitioner in 1939. The charge to Connolly of $20,000 for the transfer of fully depreciated assets does not change the result herein. If this item constituted a book gain of $20,000 to petitioner, $20,000 should be added to the book value of the assets transferred, making that figure $290,837.85, and the loss on the transfer was $82,797.71. The increase in the loss offsets the gain on the transfer of the fully depreciated assets. Connolly testified that supplies and materials were furnished on the job by T. E. Connolly, Inc., prior to April 1, 1939, and that the bills therefor, aggregating $44,839.89, were not ultimately charged to petitioner but were "washed out" in the settlement. In addition, he said there had been used on the job in 1939 substantial plant, three power shovels, three or four caterpillar tractors, 15 or 20 trucks and some compressors, owned by T. E. Connolly, Inc., the amount of the rental of which to petitioner had not been agreed upon, and which rental charge was likewise cancelled in the settlement. Although the bills for supplies and materials *219 would appear to be a proper charge against petitioner had petitioner concluded the contract, the forgiveness of the charge is not an element of the consideration to petitioner for the transfer of the assets as of April 1, 1939, since the supplies and materials remained on the job and did not become the property of petitioner. The rentals for plant and equipment used on the job, however, were liabilities of the petitioner which had been incurred, although not accrued on the books because not agreed upon or billed, and the forgiveness of which was a part of the consideration for the transfer of assets which would reduce the amount of the loss sustained. The evidence adduced, however, is not sufficient to furnish a basis for determining the rental value. The transaction involved the transfer of certain assets having a book value, after depreciation, of $270,837.85 in consideration of the payment of $208,174.31. The difference between these two amounts measures the loss taken by petitioner upon the transfer. The manner in which the agreed consideration was computed was somewhat complicated, but the essential fact is that the amount paid was less than the book value of the assets transferred. *220 Respondent argued that in the computation petitioner attempted to change its basis of accounting to a cash basis. We think it clear that no such thing was attempted. The computation had nothing to do with petitioner's accounting basis. It was a statement of the receipts and expenditures involved in the contract up to April 1, 1939, from which Rohl and Connolly could come to an agreement as to the amount to be paid by one corporation to the other upon the transfer of the contract. Respondent has not sustained the burden of proving that petitioner did not sustain the loss or that petitioner had unreported income as alleged by respondent. Decision will be entered under Rule 50. Footnotes
a. Includes salaries earned for prior years. b. Represents a consent dividend. ↩
c. Adjusted to reflect company's share of joint venture gross income and costs.↩
1. Art. 42-4 of Regulations 101 (1938).↩