17079

SUSIE REEVES EARLY *ET AL.*, Respondents, v. SOUTH
CAROLINA PUBLIC SERVICE AUTHORITY, Appellant

(90 S. E. (2d) 472)

*Messrs. R. M. Jefferies,* of Walterboro, *W. D. Simpson,* of Moncks Corner, and *E. F. Hollings* and *Robert McC. Figg, Jr.,* of Charleston, *for Appellant,*

394

*Messrs. Buist & Buist* and *Gedney M. Howe, Jr.,* of Charleston, *for Respondents,*

*Messrs. R. M. Jefferies,* of Walterboro, *W. D. Simpson,* of Moncks Corner, and *E. F. Hollings* and *Robert McC. Figg, Jr.,* of Charleston, *for Appellant, in reply,*

October 31, 1955.

LEGGE, Justice.

Respondents, owners of a tract of land in Georgetown County known as Annandale, comprising about 4,500 acres, and bordering on and traversed by tidal navigable and non-navigable streams and waters tributary to the Santee River, brought this action against appellant, claiming that as the result of appellant's works, and particularly the closing of its dam across the Santee River and the diversion thereby of a large part of the flow of that river to the Cooper River, their fast lands had been damaged, and that such damage constituted a taking of their property for public use entitling them to just compensation under the provisions of Article 1, Section 17, of the Constitution of this State. Appellant admitted the construction of its dam and the diversion of water from the Santee River to the Cooper River, but denied that the lands of the respondents had been damaged thereby; and it further contended that in the construction of the dam and the diversion of the flow of the Santee River it was acting as an agency of the State in the exercise of the sovereign power to provide, regulate and improve navigation on the Congaree, Wateree, Santee and Cooper Rivers, all navigable rivers of the State, as to the exercise of which power the property of the respondents was subject to a navigation servitude; that it had not caused any invasion of respondents' property above mean or normal high water mark of the tidal navigable waters which such property adjoins; and that the diversion of the water of the Santee River was not, and did not result in, a taking of private property by eminent domain for which respondents may claim compensation.

The cause was tried before the Honorable Joseph R. Moss, Presiding Judge, and a jury; and, appellant's motions for nonsuit and directed verdict having been overruled, the jury returned a verdict in favor of the respondents for $73,575.00.

Thereafter, appellant's motion for judgment *n. o. v.* or, alternatively, for a new trial, was overruled, and this appeal followed.

In *Rice Hope Plantation v. South Carolina Public Service Auhtority,* 216 S. C. 500, 59 S. E. (2d) 132, the plaintiff, owner of property located on the lower Santee River, alleged in its complaint that the construction of the defendant's dam had diverted into the Cooper River a large part of the normal flow of the fresh water of the Santee River; that this in turn had caused salt water from the ocean to invade the Santee River to and above the plaintiff's property, and to infiltrate into the streams, creeks, canals, ponds and drainways that ran through the property; that also by reason of the release by the defendant of water through its dam in times of freshet, or by reason of storm tides or other similar causes, the water in the creeks and water courses in and about the plaintiff's property occasionally overflowed the normal high water mark, and such overflow, being strongly saline, killed and destroyed vegetation and damaged the plaintiff's property and decreased its value. Our consideration of that case was confined to the pleadings, but the decision is of importance here in respect of several issues there decided, among them the following:

(1) South Carolina Public Service Authority is an agency of the State of South Carolina and its functions are governmental;

(2) Where its acts have resulted in a taking of private property for public use it must make just compensation to the owner therefor perforce Article 1, Section 17, of the Constitution;

(3) Its liability to a riparian owner for damages sustained by reason of the diversion of Waters from the Santee River to the Cooper River is substantially the same as that which would be applicable if the United States were involved; and

(4) The allegations of the complaint to which we have referred stated a cause for compensation for a taking of the plaintiff's property.

In the instant case, appellant's numerous exceptions actually raise two questions, to-wit:

(1) Did the acts of the appellant constitute a taking of respondents' property within the purview of Article 1, Section 17?

(2) If so, is the verdict, as to amount, supported by the evidence?

Substantially, the facts are undisputed. Annandale Plantation was purchased by Richard Early Reeves, the elder, in 1924, and upon his death in 1926 it passed to his widow and children, who are the respondents here. Prior to the construction of appellant's works, known as the Santee-Cooper Hydro-Electric and Navigation Project, the Santee was a fresh water river of so great volume as to be normally free, even near its mouth, from the salt water of the ocean. By Act of the General Assembly of South Carolina approved April 7, 1934, 38 Stat. at Large, p. 1507, appellant was created as an agency of the State of South Carolina for the improvement of navigation, the production of electric power, flood control, reforestation, and other public purposes, and was authorized and directed to construct, maintain and operate the Santee-Cooper Hydro-Electric and Navigation Project. An integral part of that project was the diversion of the greater part of the flow of the Santee River into the Cooper River; and for that purpose appellant constructed a dam across the Santee River at or near Wilson's Landing, some 80 miles up-stream from respondents' property. The dam was closed in the fall of 1941 and the upper waters of the Santee thereby impounded in the large reservoir now known as Lake Marion, from there to pass into a lower reservoir known as Lake Moultrie, and thence into the Cooper River. Following the closing of the dam, by reason of the decreased volume of its flow, the lower Santee River and its tributaries adjoining and flowing through respondents' property became saline, and in times of abnormal high tides, the salt water of the ocean, being thus carried above the normal or mean high water mark,

spread over some 2,100 acres of respondents' fast land, causing the damage for which compensation is here sought.

The area involved, which lies wholly above mean high water mark, was used, prior to the diversion of the Santee River, for the pasturage of livestock. The effect of the salinity of the water has been to destroy the normal vegetation and render this part of the property useless for pasturage. Also, it appears that the timber, where the soil has become impregnated with salt, has been damaged. The destructive effects of the salting of the land have been gradual, appearing at first in the lowest portions of the area, which were more frequently inundated, and later in the higher areas and in the timber.

The appellant summarizes its legal position as follows:

That a taking of private property in connection with the exercise of the navigation power exists, in the constitutional sense, only where there has been actual invasion of the riparian owner's fast land and the complete or partial practical ouster of or interference with his possession caused by the governmental action in question; and that consequently the debasement of value of the respondents' property which followed the diversion of the Santee, without overflow of their fast lands caused by action of the appellant, did not constitute a taking for which the respondents are entitled to compensation. The appellant thus points up the principal, and narrow, issue in the case, the two components of which are: (1) Was the salting of respondents' fast land following the diversion of the Santee River caused by appellant's act in diverting the flow of the river; and if so (2) Did such damage, and the resulting debasement of the value of the property, constitute a taking within the contemplation of Article 1, Section 17, of the Constitution?

As to the first of these questions, appellant contends that the only action by it was the diversion of a portion of the flow of the Santee River into the Cooper River, and that the salting of the respondents' property which followed was

the result not of appellant's action, but of the intervening acts of nature, for which appellant has no responsibility. In support of this contention, appellant cites *Bedford v. United States,* 1902, 192 U. S. 217, 24 S. Ct. 238, 48 L. Ed. 414, and *Jackson v. United States,* 1912, 230 U. S. 1, 33 S. Ct. 1011, 57 L. Ed. 1363. In the *Bedford case* the government had constructed a revetment along a bank of the Mississippi River to prevent further erosion at a point known as DeSoto Point, which had once been a narrow neck of land, but which had become so narrow by erosion that the river had broken through, leaving it an island. By this cut-off, the nearby City of Vicksburg had been left some miles away from the main channel of the river, and the object of the revetment was to prevent the navigable channel from receding farther from it. After the cut-off at DeSoto Point, in 1876, and the construction of the revetment in and after 1878, the channel and the current of the Mississippi were gradually directed to the lands of the claimants, situated about six miles below the cut-off, and about 1882 reached said lands and thereafter eroded and overflowed about 3,200 acres. The factual distinction between that case and the one at bar is clearly shown by the following statement by the court in the former [192 U. S. 217, 24 S. Ct. 239]:

" 'The cause of the deflection of the river upon the claimants' land was the cut-off, which shortened the distance of the stream six miles, and thereby increased the velocity of the current, and forced the current to turn, when it struck the Mississippi bank, at an abrupt angle. The revetment did not change the course of the river as it then existed, but operated to keep the course of the river at that point as it then was. If the revetment had not been built, the cut-off would have continued to widen toward the Louisiana bank and the channel would have continued to move in the same direction. With the widening of the cut-off and the shifting of the channel the angle of the turn below the cut-off would have gradually become less abrupt, and the deflection of the stream upon the claimants' land would have grown less, and

the consequent injury to the claimants' land would have been decreased. To what extent the injury would have been decreased is conjectural. The injury done to the claimants' land was an effect of natural causes; the injury caused by the government was by interrupting the further progress of natural causes, *i. e.,* the further change in the course of the river, and is also conjectural.' "

In the *Jackson case,* the claimant, owning land on the east side of the Mississippi River, sought compensation for damage to the property alleged to have resulted from the construction of a levee on the west bank, which increased the flood level in times of high water. The claimant contended that the government should have built a line of levees along the minor basins on the east bank, to afford protection there from the increased danger of overflow. But the court pointed out that such injury as may have been suffered by the claimants resulted not from the action of the appellant alone but from the concurrent action of the United States, the States, and subordinate agencies and individuals, all acting to the realization of a common end, namely, an efficient and continuous line of levees along the Mississippi; that the closing of crevasses in the western bank was necessary to prevent devastation of a vast area west of the river; that claimants had no legal right to the continued existence of such crevasses; that there was no averment that their land in the absence of all levees and in a state of nature, would not, in seasons of high water, be overflowed; and that "if it had been so alleged, it is certain that there would be no right on the part of an individual to insist that primitive conditions be suffered to remain, and thus all progress and development be rendered impossible" [230 U. S. 1, 33 S. Ct. 1018] ; and held that such damages as were claimed were, under the decision in the *Bedford case,* consequential and not proximate, and that the complaint had therefore been properly dismissed.

The only act of the appellant here was, as it claims, the diversion of a great part of the flow of the Santee River; but that act brought about the action of forces of nature which resulted in the damage here complained of. Where, as the result of an act, be it of an individual or of the sovereign, the inevitable and immutable laws of nature are brought into play, thereßy causing damage, the operation of these natural laws is not such an intervening independent act as will insulate the doer from the consequences of his act. As was said in *United States v. Chicago B. & Q. R. Co.,* 8 Cir., 82 F. (2d) 131, 137, 106 A. L. R. 942:

"It seems to us that when a given act is such as to put in force a normal law of nature, which in conjunction with the original act done, produces a harmful result, such result is necessarily a proximate cause (result?) of the act done. If this is not so, it is difficult to envision any instance of proximate cause; for man does nothing, he has never done anything, nor will he ever do anything, except move physical objects and then permit nature to take its course".

The damage to respondents' property and the resulting debasement of its value being thus the proximate result of the appellant's act, was such damage and debasement of value a taking within the contemplation of Article 1, Section 17?

In the early federal decisions, nothing short of physical expropriation was considered to be a compensable "taking" within the purview of the Fifth Amendment. *Smith v. Corp. of Washington,* 20 How. 135, 61 U. S. 135, 15 L. Ed. 858; *Knox v. Lee* and *Parker v. Davis* (Legal Tender cases), 12 Wall. 457, 79 U. S. 457, at page 551, 20 L. Ed. 287, at page 312. But in *Pumpelly v. Green Bay & M. Canal Co.,* 13 Wall. 166, 80 U. S. 166, 20 L. Ed. 557, where compensation was allowed for permanent flooding, the court said:

"It would be a very curious and unsatisfactory result, if in construing a provision of constitutional law, always un-

derstood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen and commentators as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that if the government refrains from the absolute conversion of real property to the uses of the public it can destroy its value entirely, can inflict irreparable and permanent injury to any extent; can, in effect, subject it to total destruction without making any compensation, because, in the narrowest sense of that word, it is not taken for the public use. Such a construction would pervert the constitutional provision into a restriction upon the rights of the citizen, as those rights stood at the common law, instead of the government, and make it an authority for invasion of private right under the pretext of the public good, which had no warrant in the laws or practices of our ancestors".

In *Northern Transportation Co. v. Chicago,* 99 U. S. 635, 25 L. Ed. 336, where the plaintiffs had been for a long time deprived of the use of their docks and warehouses by the work incident to construction of a tunnel under the Chicago River, recovery was denied; and the court, reaffirming the old doctrine that "acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, are universally held not to be a taking within the meaning of the constitutional provision", referred to the decision in the *Pumpelly case* as exhibiting "the extremest qualification of the doctrine".

In *Gibson v. United States,* 166 U. S. 269, 17 S. Ct. 578, 41 L. Ed. 996, the doctrine expounded in *Northern Transportation Co. v. Chicago, supra,* was held applicable where a farmer had been deprived of access to her landing on the Ohio River during the greater part of the gardening season as the result of the construction of a dike which did not come into physical contact with her land or cause water to be thrown upon it.

The doctrine that a direct taking is prerequisite to compensability under the Fifth Amendment was again asserted in *Scranton v. Wheeler,* 179 U. S. 141, 21 S. Ct. 48, 57, 45 L. Ed. 126, where the plaintiff, owning title to the submerged land adjoining his fast land, to the center file of the St. Mary's river in Michigan, had been permanently excluded from access to the navigable water of the river by reason of the construction by the government of a pier, resting entirely upon submerged land in front of his fast land, for the improvement of navigation on the river. It was observed in that case that compensation was not, and could not be, demanded for the apropriation of the submerged land, but was sought only "for the loss of plaintiff's access from his upland to navigability,"—an injury which the court held to be consequential and therefore non-compensable. See also *United States v. Commodore Park,* 324 U. S. 386, 65 S. Ct. 803, 89 L. Ed. 1017.

In *United States v. Lynah,* 188 U. S. 445, 23 S. Ct. 349, 47 L. Ed. 539, the court again considered the question of whether permanent flooding of lands was a "taking", and, following the decision in the *Pumpelly case,* held that it was. Here the majority opinion endeavors, rather unconvincingly, to reconcile its holding with that of *Northern Transportation Co. v. Chicago, Gibson v. United States, and Scranton v. Wheeler, supra,* by saying that in cases of actual taking the law implies a contract on the part of the government to pay for the property taken, while in cases of "consequential" injury to property by reason of public work, the injury is the result of a tortious act for which no cause of action against the government arises.

In *United States v. Chandler-Dunbar Water Power Co.,* 229 U. S. 53, 33 S. Ct. 667, 57 L. Ed. 1063, a condemnation proceeding incident to the improvement of navigation in, and around the falls, of, the St. Mary's river, the claimant, which had been developing water power from the rapids, demanded compensation not only for its upland and the installations thereon, but also for its loss of the water power

of the stream. Compensation for the former was allowed as a matter of course, but here it was held that, as against the right of the government to act in aid of navigation, the riparian owner has no compensable interest in the waterpower of the stream because, being within the bed of the stream, it is subject to the navigation servitude. *Cf. United States v. Twin City Power Co.,* 4 Cir., 1954, 215 F. (2d) 592, where the court pointed out that even where improvement of navigation is the purpose, any taking of fast land outside the bed of the stream must be compensated for, and that the value of condemned land as a potential power site on a navigable stream constituted an element of just compensation.

Permanent flooding was held compensable in *United States v. Grizzard,* 219 U. S. 180, 31 S. Ct. 162, 55 L. Ed. 165; and in *United States v. Cress,* 243 U. S. 316, 37 S. Ct. 380, 385, 61 L. Ed. 746, it was held that the frequent overflowing of claimant's land located on a non-navigable creek tributary to the Cumberland river in Kentucky, resulting from the construction of a lock and dam on that river, was a taking. To quote briefly from the opinion in the last cited case:

"It is true that in the *Pumpelly case* there was an almost complete destruction, and in the *Lynah case* a complete destruction, of the value of the lands, while in the present case the value is impaired to the extent of only one half. But it is the character of the invasion, not the amount of damage resulting from it, so long as the damage is substantial, that determines the question whether it is a taking." *Cf. Jacobs v. United States,* 290 U. S. 13, 54 S. Ct. 26, 78 L. Ed. 142.

The liberalization, in modern decisions, of the concept of a constitutional taking, which was pointed out in *United States v. Chicago, B. & Q. R. Co., supra,* is clearly shown in *United States v. General Motors Corp.,* 323 U. S. 373, 65 S. Ct. 357, 89 L. Ed. 311, where it was declared that the constitutional requirement of just compensation for the taking of private property for public use is addressed to every sort of interest which the citizen may possess in the thing

taken, and that any governmental action the effect of which is to deprive the owner of all or most of his interest in the subject matter amounts to a "taking" in the constitutional sense.

The holding in the case last mentioned in nowise impinges upon the dominant power of the government in the interest of navigation, for there can be no doubt, since *Willink v. United States,* 240 U. S. 572, 36 S. Ct. 442, 60 L. Ed. 808, *United States v. Chicago, M., St. P. & P. R. Co.,* 312 U. S. 592, 61 S. Ct. 772, 85 L. Ed. 1064, and *United States v. Willow River Power Co.,* 324 U. S. 499, 65 S. Ct. 761, 89 L. Ed. 1101, that that power extends to the entire bed of the stream, *i. e.,* to ordinary high water mark on either side, and that whatever private property rights or interests a riparian owner may have within those boundaries may be taken or destroyed in the exercise of that power without obligation on the part of the government to compensate him therefor, because they always were, and always will be, subject to the navigation servitude. It is noted that in *United States v. Chicago, M., St. P. & P. R. Co., supra,* the court pointed out that the decision in the *Lynah case* is not to be interpreted as holding that a riparian owner is entitled to be compensated for the injury to or destruction of his property located in the bed of a navigable stream, because in the *Lynah case,* although part of the property lay below mean high water mark, it was held that the flooding destroyed the value of the whole.

But it does not follow that damage to fast land beyond those boundaries is non-compensable merely because the action of the government does not result in raising the normal water level. Thus in *United States v. Kansas City Life Insurance Co.,* 339 U. S. 799, 70 S. Ct. 885, 94 L. Ed. 1277, where agricultural land bordering upon a non-navigable tributary of the Mississippi River had become waterlogged as the result of the maintenance of the Mississippi continuously at ordinary high water level by a dam constructed by the government for the improvement of navigation, it was

held that the landowner was entitled to compensation as for a taking.

Appellant maintains, however, that in the case at bar there was no invasion of respondents' fast land by either overflowing or underflowing; that the mean high water level of the Santee River has not been artificially maintained; that on the contrary the tide ebbs and flows as it did before, being at mean high water no higher than it had been prior to the diversion of the river; and that in fact respondents' damage has resulted from the natural tidal movements of the ocean, against which appellant was under no duty to protect them. But the issue is not so simply resolved. The right of the sovereign, in the exercise of the navigation servitude, to take or damage or destroy private property without obligation to compensate therefor extends to the bed of the navigable stream, *i. e.* to mean high water mark on either bank— and no farther; for damage beyond that boundary the Constitution requires just compensation. One of the immutable laws of nature is that tides periodically, depending upon the relative positions of sun, moon and earth, and upon the direction and strength of the wind, rise above the mean of normal high water mark. Such invasion of fast land is not a fortuitous happening; it is, within common knowledge, inevitable; and if, because of the act of the sovereign, such periodic overflow, which before had been harmless, has been made destructive, the damage so caused proximately results from the sovereign's act.

As hereinbefore noted, the federal courts have, except in the very early cases, construed the "taking" of private property under the Fifth Amendment to include "damaging". The comparable provision, Article 1, Section 17, of the Constitution of South Carolina, upon which respondents base their claim, has for many years been so construed by this court. *Chick Springs Water Co. v. State Highway Department,* 159 S. C. 481, 157 S. E. 842; *Milhous v. State Highway Department,* 194 S. C. 33, 8 S. E. (2d) 852, 128 A. L. R. 1186. And we have repeatedly affirmed the principle

that the protection of Article 1, Section 17, extends to all cases in which any of the essential elements of ownership has been destroyed or impaired as the result of the erection or maintenance of a public work or enterprise, whether or not there has been a physical invasion of the property itself. *Gasque v. Town of Conway*, 194 S. C. 15, 8 S. E. (2d) 871; *Moss v. State Highway Department*, 223 S. C. 282, 75 S. E. (2d) 462.

Implicit in the jury's verdict here was the finding that appellant's action resulted in the taking of respondent's property within the purview of Article 1, Section 17. The evidence amply sustains that finding.

There remains for consideration the matter of damages.

By several exceptions, addressed respectively to the trial judge's rulings on its motions for nonsuit, direction of verdict, judgment notwithstanding the verdict, and new trial, appellant insists that the verdict cannot stand because it is not supported by any evidence of the market value of the whole property before and after the taking. In our approach to this issue, we note that respondents made claim only for the damage to that portion of their fast lands that was subjected to periodical overflow by salt water. No claim of special, or severance, damage was made. The issue in that regard was clearly stated to the jury in the following portion of the charge, to which no exception is taken: "Their (*i. e.* respondents') claim is limited to what you may find from the evidence to be the difference between the fair market value of any property taken by the defendant for public use before the taking and immediately after the taking, if you find that there has been a taking".

As shown on a plat made by the John McCrady Company, Engineers, dated April, 1953, which was in evidence, the portion of the Annandale property that respondents claimed had been damaged by salt water comprises 2,133 acres, of which, as Mr. McCrady testified, 783 acres are located on Minim Island and 1,350 acres on the mainland north of Minim Creek.

C. E. Graham Reeves, one of the respondents, was permitted without objection to testify that prior to the invasion by salt water Minim Island had a value of $50.00 per acre, and that its value at the time of the trial was $10.00 per acre; and that the area on the mainland was worth between $50.00 and $100.00 per acre when the water was fresh, as against $15.00 per acre after the salting.

James R. Cook, Professor of Animal Husbandry at Clemson Agricultural College, testified that as an area favorable for the raising of livestock the rice field area, if the water were fresh, would be worth between $75.00 and $100.00 an acre, and that with salt in the soil it is practically valueless.

M. L. McLeod, a witness engaged in business as a lumberman, cattle raiser and rice grower, testified that the property in question, under fresh water conditions and with the banks "under break" (i. e., not adequate to control the water), was worth $50.00 per acre; and that in its present condition, subject to salt water overflow, it has no value.

Ernest F. Middleton, a real estate and timber broker, testified that in his opinion, assuming the dikes to be in poor condition, the value of the land on Minim Island under fresh water conditions was $50.00 per acre and the value of the mainland area north of Minim Creek $100.00 per acre; and that in its present condition, subject to invasion of salt water, the land on Minim Island is worth $2.00 per acre and the mainland area between $35.00 and $50.00 per acre.

Ernest Nutting, a practicing forester, testified that he had inspected the area in question in the spring of 1953 and again in the summer and again in the fall of that year. He estimated the value of timber within the area in question that had, within the past 10 or 15 years, died as the result of "unfavorable conditions" to be as follows, based upon market values as of 1943 and 1948:

| Merchantable pine | | Market value as of | | | | 1943 | $ 9,375.00 |
|---|---|---|---|---|---|---|---|
| | | " | " | " " | 1948 | | 15,600.00 |
| " | cypress | " | " | " " | 1943 | | 2,800.00 |
| | | " | " | " " | 1948 | | 5,600.00 |
| " | hardwood | " | " | " " | 1943 | | 1,125.00 |
| | | " | " | " " | 1948 | | 2,250.00 |
| " | pulpwood | " | " | " " | 1943 | | 1,237.00 |
| " | (pine) | " | " | " " | 1948 | | 2,268.00 |
| " | pulpwood | " | " | " " | 1943 | | 468.75 |
| " | (hardwood) | " | " | " " | 1948 | | 937.50 |

This witness testified that the death of the timber referred to was not caused by insects, and could have been caused by salting of the water, but that he did not feel qualified to make any positive statement as to the actual cause. He testified that within the area in question timber is still dying.

Appellant's quarrel with the foregoing testimony is that the per acre values for land and the testimony as to dead timber all refer to "various elements" of damage and are not "tied in" either with the number of acres or with the value of the property as a whole before and after the taking. We are unable to agree with this contention. There was before the jury evidence in the form of the plat and the testimony of Mr. McCrady as to the number of acres involved; and only a simple mathematical calculation was required to translate the testimony of these witnesses (other than Nutting) into terms of damage to the whole area involved. The fact that property taken should be valued as a whole for the purpose of assessing compensation for the taking "does not preclude the admission of testimony showing particular elements of value for consideration by the jury in arriving at the overall value which they are required to find as the basis of compensation". *Cade v. United States,* 4 Cir., 213 F. (2d) 138, 142.

There was testimony by the respondent C. E. Graham Reeves, not objected to by appellant, to the effect that re-

spondents had built a dike, at a cost of $2,500.00 per mile, in an effort to keep out the salt water; that they had later raised it, at a cost of $2,000.00 per mile; and that it would cost about $7,000.00 per mile, exclusive of the cost of trunks, to construct dikes large enough to protect the property. Appellant points out: (1) that the witness did not testify to the number of miles of dikes actually constructed or that would be required; and (2) that such costs are not a proper element of just compensation for a taking. As to (1), it is wholly immaterial that Mr. Reeves did not himself testify to the number of miles of diking involved, for the record shows that Mr. McCrady testified that 4.83 miles of dike would be required to protect the mainland rice field area of 1,350 acres, and 10.87 miles would be required to protect the Minim Island area if Cork Creek, a small creek lying wholly within Minim Island and emptying into Minim Creek, were diked on both banks, and 7.03 miles to protect the Minim Island area if Cork Creek were cut off. As to (2), we note that counsel for respondents, in his questions to the witness Reeves, expressly indicated that the testimony concerning dikes constructed by respondents was directed not to the issue of just compensation, but to the point that respondents had endeavored to minimize their damages. Moreover, in his charge the trial judge clearly instructed the jury that "the plaintiffs, if they are entitled to just compensation, are not entitled in law to recover against the defendant for any costs or expenses to which they may have gone, or may go in the future, in building dikes and dams, or in making other improvements on the property in question". We find no error here.

Finally, appellant contends that the verdict was excessive in that it "exceeded any evidence in the record which could properly be considered by the jury under the court's charge in arriving at compensation, and clearly embraced items and elements which are not compensable under the court's charge". Had the jury applied to the whole area involved the debasement in value per acre testified to

by any of the witnesses Reeves, Cook, McLeod or Middleton, they could have found a verdict much larger than they did. This testimony was unobjected to and was of course competent, for evidence of real estate values is largely a matter of opinion. *United States v. 25.406 Acres of Land,* 4 Cir., 172 F. (2d) 990. Its weight was for the jury alone. In passing upon appellant's motion for a new trial, the trial judge considered the amount of the verdict and concluded that it was not excessive. Since it is supported by competent evidence, we are not concerned with its amount unless it be so grossly excessive as to indicate that the jury was moved by passion or prejudice or other considerations not founded on the evidence and the instructions of the trial court, which does not appear to be the case here.

All exceptions have been considered, and are overruled.

Affirmed.

BAKER, C. J., and STUKES, TAYLOR and OXNER, JJ., concur.